UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

PAUL BURNS,
      Petitioner,

vs.                           Case No.: 3:19cv394/LAC/EMT

MARK S. INCH,
      Respondent.
_____/

## REPORT AND RECOMMENDATION

Petitioner Paul Burns (Burns) filed a petition for writ of habeas corpus under 28 U.S.C. § 2254 (ECF No. 1). Respondent (the State) filed an answer and relevant portions of the state court record (ECF No. 24). Burns filed a reply (ECF No. 27).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C) and Fed. R. Civ. P. 72(b). After careful consideration of the issues presented by the parties, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rule 8(a), Rules Governing Section 2254 Cases. It is further the opinion of the undersigned that the pleadings and attachments before the court show that Burns is entitled to federal habeas relief only as to the ineffective

assistance of appellate counsel claims asserted in Grounds Three and Seven of the § 2254 petition.

## I.   BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are established by the state court record (*see* ECF No. 24).[1]   Burns was charged in the Circuit Court in and for Walton County, Florida, Case No. 2011-CF-702, with one count of sexual battery (victim less than twelve years of age) (App. A at 16).   Burns retained private trial counsel (App. A at 12).   On August 7, 2012, a jury found Burns guilty as charged (App. A at 92 (verdict), App. E (trial transcript)).   The court sentenced Burns to a term of natural life in prison with a twenty-five year minimum mandatory and 243 days of jail credit (*id.* at 120–24).   The court also designated Burns as a sexual predator (*id.* at 110–11).

The Florida First District Court of Appeal (First DCA) granted Burns a belated direct appeal (*see* Apps. G, H, I).   *Burns v. State*, 128 So. 3d 943, 944 (Fla. 1st DCA 2013) (Mem).   In the direct appeal, Case No. 1D14-170, Burns filed a counseled initial brief (App. J).   The First DCA affirmed the judgment per curiam without

---

[1] Citations to the state court record refer to the exhibits submitted with the State's answer (ECF No. 24).   If a cited page has more than one page number, the court refers to the "Bates stamp" page number.

written opinion on June 30, 2015 (*see* App. L).   *Burns v. State*, 171 So. 3d 703 (Fla. 1st DCA 2015) (Table).   The mandate issued September 1, 2015 (App. O).

On February 10, 2016, Burns filed a motion to correct illegal sentence in the circuit court, pursuant to Rule 3.800 of the Florida Rules of Criminal Procedure, challenging the twenty-five-year minimum mandatory part of his sentence (App. P). The State conceded that the court should remove the minimum mandatory (App. R). On December 15, 2016, the circuit court granted Burns' motion and directed the clerk of court to correct the judgment and sentence to remove the minimum mandatory provision (App. S).   An amended judgment and sentence rendered December 20, 2016 (App. T).

On February 19, 2016, Burns filed a petition for writ of habeas corpus in the First DCA, Case No. 1D16-801, alleging ineffective assistance of appellate counsel (App. U).   The First DCA denied the petition on the merits on July 10, 2018, and denied Burns' motion for rehearing on August 30, 2018 (Apps. EE (opinion), FF (motion for rehearing), GG (order)).   *Burns v. State*, 248 So. 3d 1113 (Fla. 1st DCA 2018) (Table).

On October 4, 2018, Burns filed a motion for post-conviction relief in the state circuit court, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure

(App. HH at 10–50).    On October 30, 2018, the state circuit court summarily denied the Rule 3.850 motion (*id.* at 88–91).    Burns appealed the decision to the First DCA, Case No. 1D19-2220 (App. II (notice of appeal), App. KK (initial brief)).    The First DCA affirmed the circuit court's decision per curiam without written opinion on January 15, 2020 (App. MM).    *Burns v. State*, 288 So. 3d 1192 (Fla. 1st DCA 2020) (Table).    The mandate issued February 12, 2010 (App. NN).

Burns filed the instant federal habeas action on February 5, 2019 (ECF No. 1).

## II.    STANDARD OF REVIEW

A federal court "shall not" grant a habeas corpus petition on any claim that was adjudicated on the merits in state court unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court."    28 U.S.C. § 2254(d)(1).    The United States Supreme Court explained the framework for § 2254 review in *Williams v. Taylor*, 529 U.S. 362 (2000).[2]    Justice O'Connor described the appropriate test:

---

[2] Unless otherwise noted, references to *Williams* are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13).    The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring).

Under the *Williams* framework, the federal court must first determine the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision."  *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003).  After identifying the governing legal principle, the federal court determines whether the state court's adjudication is contrary to the clearly established Supreme Court case law.  The adjudication is "contrary" only if either the reasoning or the result contradicts the relevant Supreme Court cases.  *See Early v. Packer*, 537 U.S. 3, 8 (2002) ("Avoiding th[e] pitfalls [of § 2254(d)(1)] does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them.").

If the "contrary to" clause is not satisfied, the federal court determines whether the state court "unreasonably applied" the governing legal principle set forth in the

Supreme Court's cases. The federal court defers to the state court's reasoning unless the state court's application of the legal principle was "objectively unreasonable" in light of the record before the state court. *See Williams*, 529 U.S. at 409; *Holland v. Jackson*, 542 U.S. 649, 652 (2004). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

Section 2254(d) also allows habeas relief for a claim adjudicated on the merits in state court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The "unreasonable determination of the facts" standard is implicated only to the extent the validity of the state court's ultimate conclusion is premised on unreasonable fact finding. *See Gill v. Mecusker*, 633 F.3d 1272, 1292 (11th Cir. 2011). As with the "unreasonable application" clause, the federal court applies an objective test. *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (holding that a state court decision based on a factual determination "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding."). "The question under AEDPA is not whether a federal court believes the state court's

determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410). AEDPA also requires federal courts to "presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'" *Landrigan*, 550 U.S. at 473–74 (quoting 28 U.S.C. § 2254(e)(1)).

The Supreme Court has often emphasized that a state prisoner's burden under § 2254(d) is "difficult to meet, . . . because it was meant to be." *Richter*, 562 U.S. at 102. The Court elaborated:

> As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings. *Cf. Felker v. Turpin*, 518 U.S. 651, 664, 116 S. Ct. 2333, 135 L. Ed. 2d 827 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244). It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no further. Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. *Jackson v. Virginia*, 443 U.S. 307, 332, n.5, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979) (Stevens, J., concurring in judgment). As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Richter*, 562 U.S. at 102–03 (emphasis added).

A federal court may conduct an independent review of the merits of a petitioner's claim only if it first finds that the petitioner satisfied § 2254(d). *See Panetti v. Quarterman*, 551 U.S. 930, 954 (2007). Even then, the petitioner must show that he is in custody "in violation of the Constitution or laws and treaties of the United States," *see* 28 U.S.C. § 2254(a), and that the constitutional error resulted in "actual prejudice," meaning, the error "had a substantial and injurious effect or influence in determining the jury's verdict," *see Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (internal quotation marks and citation omitted).

## III. EXHAUSTION AND PROCEDURAL DEFAULT

It is a long-standing prerequisite to the filing of a federal habeas corpus petition that the petitioner exhaust available state court remedies, *see* 28 U.S.C. § 2254(b)(1), thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971) (citation omitted)). To satisfy the exhaustion requirement, the petitioner must "fairly present" his claim in each appropriate state court, alerting that court to the federal nature of the claim.

*Duncan*, 513 U.S. at 365–66; *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999);
*Picard*, 404 U.S. at 277–78.

An issue that was not properly presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, that is, procedurally barred from federal review. *See Bailey v. Nagle*, 172 F.3d 1299, 1302–03 (11th Cir. 1999). This court will also consider a claim procedurally defaulted if it was presented in state court and rejected on the independent and adequate state ground of procedural bar or default. *See Coleman v. Thompson*, 501 U.S. 722, 734–35 & n.1 (1991); *Caniff v. Moore*, 269 F.3d 1245, 1247 (11th Cir. 2001) ("[C]laims that have been held to be procedurally defaulted under state law cannot be addressed by federal courts."); *Chambers v. Thompson*, 150 F.3d 1324, 1326–27 (11th Cir. 1998) (applicable state procedural bar should be enforced by federal court even as to a claim which has never been presented to a state court); *accord Tower v. Phillips*, 7 F.3d 206, 210 (11th Cir. 1993); *Parker v. Dugger*, 876 F.2d 1470 (11th Cir. 1990), *rev'd on other grounds*, 498 U.S. 308, 111 S. Ct. 731, 112 L. Ed. 2d 812 (1991). In the first instance, the federal court must determine whether any future attempt to exhaust state remedies would be futile under the state's procedural default doctrine. *Bailey*, 172 F.3d at 1303. In the second instance, a

federal court must determine whether the last state court rendering judgment clearly and expressly stated its judgment rested on a procedural bar.  *Id.*

A federal court is not required to honor a state's procedural default ruling unless that ruling rests on adequate state grounds independent of the federal question.  *See Harris v. Reed*, 489 U.S. 255 (1989).  The adequacy of a state procedural bar to the assertion of a federal question is itself a federal question.  *Lee v. Kemna*, 534 U.S. 362 (2002).  The federal court "lacks jurisdiction to entertain a federal claim on review of a state court judgment, if that judgment rests on a state law ground that is both independent of the merits of the federal claim and an adequate basis for the court's decision."  *Foster v. Chatman*, 136 S. Ct. 1737, 1745 (2016) (internal quotation marks and citation omitted).  Even where a state court has ruled in the alternative, addressing both the independent state procedural ground and the merits of the federal claim, the federal court should apply the state procedural bar and decline to reach the merits of the claim.  *Alderman v. Zant*, 22 F.3d 1541, 1549 (11th Cir. 1994) (citing *Harris*, 489 U.S. at 264 n.10).

The Eleventh Circuit has set forth a three-part test to determine whether a state court's procedural ruling constitutes an independent and adequate state rule of decision.  *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001).  First, the last state

court rendering judgment must clearly and expressly state it is relying on state procedural rules to resolve the federal claim.   Second, the state court's decision on the procedural issue must rest entirely on state law grounds and not be intertwined with an interpretation of federal law.   *Id.*   Third, the state procedural rule must be adequate.   *Id.*   The adequacy requirement has been interpreted to mean the rule must be firmly established and regularly followed, that is, not applied in an arbitrary or unprecedented fashion.   *Id.*

To overcome a procedural default, the petitioner must show cause for the default and prejudice resulting therefrom, or that the federal court's failure to reach the merits of the claim would result in a fundamental miscarriage of justice.   *Tower*, 7 F.3d at 210; *Parker*, 876 F.2d 1470.   "For cause to exist, an external impediment, whether it be governmental interference or the reasonable unavailability of the factual basis for the claim, must have prevented petitioner from raising the claim." *McCleskey v. Zant*, 499 U.S. 467, 497 (1991) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)).   To satisfy the miscarriage of justice exception, the petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent."   *Schlup v. Delo*, 513 U.S. 298, 327 (1995).   "To establish the requisite probability, the petitioner must show that it is more likely than

not that no reasonable juror would have convicted him." *Schlup*, 513 U.S. at 327.

Further:

> a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare. To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.

*Id.*

IV.    BURNS' CLAIMS

   **A.    Ground One:    "The trial court erred reversibly in denying Petitioner's motion to be declared partially indigent for the purpose of hiring an expert witness and in denying a continuance for Petitioner to attempt to raise the money to pay the expert."**

Burns retained counsel to represent him in the trial proceedings (App. A at

12). Burns alleges that one of the items disclosed by the State during discovery was

an audio recording of the victim, T.V., being interviewed by her mother (hereinafter

referred to as the mother's **second** interview) (ECF No. 1 at 8–11).[3]  Burns alleges

that during a hearing on another matter (i.e., the admissibility of statements made by

T.V. during her mother's **first** interview and during a forensic interview with the

---

[3]  References to the § 2254 petition are to the page numbers automatically assigned by the court's electronic filing system, rather than any page numbers that appear in the original document.

Child Protection Team (CPT) (that occurred after both of the mother's interviews)),
the State indicated that it did not intend to introduce the recording of the mother's
second interview into evidence at trial.   Burns alleges defense counsel stated that
the defense intended to admit it at trial as evidence that the mother used suggestive
techniques during the second interview, which tainted T.V.'s statements during the
subsequent CPT interview and her trial testimony.   Burns alleges defense counsel
filed a motion for determination of partial indigency to enable the defense to hire an
expert to evaluate the mother's interview techniques during the second interview and
to determine whether they were impermissibly suggestive and, thus, led to unreliable
statements by T.V.   Burns asserts that the trial court failed to grant his request for
partial indigency status and failed to grant him a continuance to raise funds to pay
for an expert to evaluate the mother's second interview.   Burns contends that the
trial court's denial of the opportunity to hire an expert to assess the mother's
techniques during the second interview deprived him of a meaningful opportunity to
impeach the mother's and T.V.'s credibility and thus prevented him from presenting
a complete defense.   Burns asserts that he presented Ground One to the state court
on direct appeal (*id.* at 12).

The State concedes Burns exhausted this claim on direct appeal (ECF No. 24 at 17–18). The State contends Burns has not shown that the state court's decision was contrary to or an unreasonable application of clearly established federal law (*id.* at 18–28).

The state court record establishes that on June 21, 2012, approximately six weeks prior to trial, the State filed a notice of its intent to introduce two sets of T.V.'s hearsay statements: (1) T.V.'s statements to her mother, Candace Herrick, when T.V. *initially* disclosed she was sexually battered by Burns (hereinafter referred to as the mother's **first** interview), and (2) T.V.'s statements during the CPT interview (App. A at 31–33). The defense opposed admission of T.V.'s hearsay statements; therefore, the trial court held a hearing about one week prior to trial, on July 31, 2012 (*see* App. B).

At the July 31 hearing, Candace Herrick testified that in August of 2011, T.V. "walked out with her shorts pulled down in a V in front with rolled—the long end of the Silly Putty holding down [sic] in that area" (App. B at 14–15). Ms. Herrick testified she asked T.V. "What was that?" and T.V. responded, "I have a tail." (*id.* at 15). Ms. Herrick testified she told T.V. that it was "gross" and "nasty," and asked her not to do it again (*id.*). Ms. Herrick testified that she and T.V.'s father, Jeffery

Varner, had used the word "tail" to refer to a penis when T.V. was younger and accidentally walked into the bathroom when Varner was disrobed (*id.* at 15, 19–20). Ms. Herrick testified she asked T.V. if "Uncle Pauly" (Burns) had ever touched her or done anything inappropriate to her, and T.V. responded yes (*id.* at 15). Ms. Herrick continued:

> She told me that he licked her tutu.  That he placed his penis on her tutu and accidentally tee teed and had to clean it up with a rag.  She told me that—I asked her, I said, What did you say?  She said, I said, Uncle Pauly, stop, that hurts.  And I said, What did Uncle Pauly say? He said, I can't help myself.

(App. B at 16).  Ms. Herrick testified that T.V. told her this occurred while she and Burns were in his car at Silver Sands Mall and in a garage (*id.* at 17).  Ms. Herrick testified that after this initial disclosure, T.V. made additional statements about Burns' behavior (*id.*).

On cross-examination, Ms. Herrick testified she did not give T.V. any praise when she was giving certain responses during her initial questioning (*see* App. B at 18).  Ms. Herrick further stated she did not mention any type of reward while T.V. was answering her questions during the initial questioning (*id.*).

Defense counsel then asked Ms. Herrick if she later made a recording of her and T.V. discussing the alleged incident with Burns (i.e., the mother's second

interview) (App. B at 18–19).   Ms. Herrick responded yes, and testified that the day

after T.V.'s initial disclosure, she recorded a conversation between herself and T.V.,

with T.V.'s father present (*id.* at 19).   Ms. Herrick testified she asked T.V. questions

that were similar to what she had asked the day before, and T.V.'s responses were

consistent (*id.* at 20).   Ms. Herrick denied that she praised T.V. or mentioned ice

cream during the second interview (*id.* at 19).   Ms. Herrick testified that when she

began this second interview, T.V. was "very distraught" and was screaming,

growling, and yelling (Ms. Herrick explained that T.V. is autistic) (*id.* at 14, 20).

Ms. Herrick denied that she coached T.V. to answer any question in a particular

manner (*id.* at 21).

The court heard argument from the parties (App. B at 22–24).   Defense

counsel argued that the standard for admissibility of T.V.'s hearsay statements was

reliability.   Counsel argued there was no physical evidence of abuse, there were no

other witness besides T.V., and T.V. had given conflicting statements.   Counsel

continued:

> What I would like to do is—there's a recording where the mother asks
> the child various questions [i.e., the second interview].   And I think the
> recording is very poor quality, but it will demonstrate that the questions
> were extremely leading, that there was some praise in there, as well as
> I think at the end of the recording that she had done well and now it's
> time for ice cream.

(App. B at 23).

The State argued that it was seeking to admit only T.V.'s statements during her **initial** disclosure to Ms. Herrick, and was not seeking to admit the audio recording created by Ms. Herrick the next day (the **second** interview) (App. B at 23–24).

Defense counsel attempted to explain that the reason he was requesting admission of the second interview was to show that the mother's questioning techniques during the second interview "tainted" T.V.'s other statements (her statements during the mother's **first** interview, and her statements during the subsequent CPT interview) (App. B at 24).    The court interrupted, "[Y]ou can bring that up when you get to that point and we'll take a look at that, but that's not what's before the Court today." (*id.*).    Defense counsel responded, "Okay." (*id.*).    The court then ruled that the hearsay statements which the State sought to introduce (i.e., T.V.'s statements during the mother's **first** interview and during the CPT interview) were admissible (*id.*).

At the conclusion of the July 31 hearing, the court confirmed with the parties that the case was set for trial the following week (the week beginning August 6, 2012) (App. B at 26).    Defense counsel then raised the issue of a defense expert:

MR. LEVY [defense counsel]:   . . . I do want to talk to my client. I believe he's indigent.   I think—I wasn't provided the recording [of the mother's second interview] until July between the mother and the child that she recorded as far as what occurred and what happened and I'm going to talk to my client about possibly getting an expert, getting him declared indigent and a motion for pretrial indigency to try and get the expert to come in to show that—

THE COURT:   Are you talking about getting the expert to come in next week?

MR. LEVY:   Well, I'm going to ask for a continuance potentially.

THE COURT:   Well, how long have you known about this tape that the mother made?

MR. LEVY:   I just got the tape I think July 3rd was when I received it.

THE COURT:   And what would the expert do?

MR. LEVY:   I believe that the questioning was excessively suggestive and given the child's condition and the fact that she's given so many inconsistent statements, I think it would help to explain to the jury at least on my client's behalf.

THE COURT:   Well, now the recordings from that tape, the State's not seeking to elicit any testimony from that, correct?

MR. LEVY:   Well, I think it would probably be admissible. There's going to be multiple inconsistent statements and so I think it will be an exception to hearsay.   The child has never been consistent throughout.   Some of the things have been consistent, but there's been variations of situations throughout.
. . . .

> THE COURT:  It's on track to go to trial.  I don't know of anything that—but whatever motions you want to bring, you bring them and we'll look at them.

(App. B at 26–28).

On August 2, 2012 (four days prior to trial), defense counsel filed a Motion for Determination of Partial Indigency for Costs (App. A at 63–64).  Counsel asserted that Burns depleted his personal savings to pay attorney's fees associated with the criminal charge and did not have sufficient funds to pay the costs associated with his defense, specifically, the hiring of an expert to "assess the suggestive interviewing procedures utilized by the mother [during the second questioning] of the alleged victim, who is autistic, and to provide expert testimony on the scientific principle that improper interviewing practices can result in unreliable allegations" (App. A at 63).

The court held a hearing on the motion the same day (August 2, 2012) (*see* App. C).  Defense counsel argued that he intended to introduce the audio recording of the mother's second interview of T.V. into evidence, and he wished to present expert testimony to show that the mother's suggestive interview techniques during the second interview could affect the reliability of T.V.'s statements during her other two interviews and her anticipated trial testimony (*id.* at 3).  Defense counsel

conceded that he did not have any cases directly on point, but he offered one Florida case dealing with the admissibility of expert testimony on a different subject, *Harrison v. State*, 33 So. 3d 727 (Fla. 1st DCA 2010) (*see* App. A at 39–43; App. C).

In *Harrison*, the First DCA held that the trial court erred in excluding testimony from the defense's expert (Dr. Larson) about the formation of children's memories, where:  (1) defense counsel identified the expert, (2) defense counsel proffered that the expert was prepared to testify that experts in the field determined that reports of child sexual abuse are false thirty percent of the time, (3) the defense theory was that memories from early childhood are unreliable and susceptible to distortion by external factors, and (4) the proffered expert testimony was "highly relevant" and "went to the heart" of the defense (*see* App. A at 39–43 (copy of opinion)).  *Harrison*, 33 So. 3d at 729–32.

Defense counsel also offered a case from another jurisdiction, *Jenkins v. Commonwealth of Kentucky*, 308 S.W. 3d 704 (Ky. 2010) (*see* App. A at 44–62). In *Jenkins*, the Kentucky Supreme Court held, as a matter of first impression, that testimony from the defense's expert (Dr. Campbell) on improper interviewing techniques was admissible in a sexual abuse prosecution, pursuant to a state rule of

evidence allowing a qualified expert to testify in the form of an opinion or otherwise with respect to scientific, technical, or other specialized knowledge, where Dr. Campbell's qualifications were undisputed, his uncontroverted testimony and lengthy report satisfied the *Daubert* standard to establish scientific reliability, his testimony was highly relevant, and his testimony would have assisted the trier of fact (*see* App. A at 44–62 (copy of opinion)). *Jenkins*, 308 S.W. 3d at 712. The *Jenkins* court also held that the trial court erred by denying the defense's request to introduce tape recordings of a detective's interviews with the child victim, during counsel's cross-examination of the detective. *Id.* at 713. The court held that the taped interviews were not being offered for the truth of the matter asserted, nor to impeach the victim; rather, the tapes were offered as proof that the investigation was flawed from the very beginning, by showing the coercive and suggestive manner in which the interviews were conducted and the allegations obtained. *Id.*

The State objected to the defense's seeking to admit the audio recording of the mother's second interview as substantive evidence (App. C at 3, 7).

The trial court denied defense counsel's motion for a determination of indigency for costs, on the ground that counsel was seeking to appoint an expert to examine "testimony that's not even sought to be elicited" (App. C at 8).

On August 6, 2012, the day of jury selection, defense counsel filed a written

motion for continuance (App. A at 66–69).   Counsel asserted that he intended to

introduce the audio recording of the mother's second interview as substantive

evidence that T.V.'s allegations, both before and after the questioning, were the

product of the mother's suggestive interview techniques.   Counsel argued the

following in his written motion:

> The Defendant intends to introduce the tape into evidence at trial in his
> defense.   Moreover, the Defendant asserts that the tape is admissible
> at trial.   The Defendant is not offering the taped interview to prove the
> truth of the matter asserted nor to impeach a witness but to assert that
> the child was initially interviewed by the mother and the improper
> manner in which the mother questioned the child rendered the initial
> and future allegations unreliable.   As such, the intended usage of the
> interview is proper, nonhearsay use.   *See* § 90.801(c), Florida Statutes.
> *See also Jenkins v. Kentucky*, 308 S.W. 3d 704, 713 (Ky. 2010) (holding
> police interview tapes containing suggestive interview tactics were
> admissible).
>
> Alternatively, the Defendant would argue that the interview of the child
> is admissible to demonstrate bias or improper influence.

(App. A at 66–67).   Counsel conceded that the admissibility of expert testimony

regarding improper interviewing techniques was an issue of first impression in

Florida (*id.*).   Counsel again cited *Harrison* and *Jenkins*, *supra*, in support of his

argument that the recording of the mother's second interview was admissible, and

that other jurisdictions had recognized the admissibility of expert testimony in this

area (*id.*).   And counsel relied on cases from other non-Florida jurisdictions to support his argument that expert testimony regarding improper interview techniques was admissible (*id.*).   Counsel argued that regardless of the court's indigency determination, due process required a continuance to provide the defense additional time to obtain "an expert regarding the suggestive interviewing techniques employed by Candace Herrick and the impact of those techniques on the alleged victim's allegations" (*id.* at 69).   Defense counsel did not identify such an expert (*see id.*).

The trial court held a hearing on defense counsel's motion for continuance (App. D).   Defense counsel argued that even if Burns was not determined to be indigent, counsel still wanted a continuance to have an opportunity to raise funds to hire an expert (*id.* at 2).   Again, defense counsel did not identify an expert or indicate that he had even attempted to contact one.   The trial court denied the request for continuance for the following reasons:

> Well, the Court's ruling really—and it may need to be clarified this morning before we select a jury.   I really didn't know there was an issue of indigency.   The reason being I felt like that was a moot issue because as I understand it the alleged interview was not sought by the State to be introduced in their case in chief.
>
> Now, as I understand, the Defense wishes to introduce that at trial and that is something that may be an evidentiary issue; may not.   I don't know.   But the cases that the Court has been familiar with in the

> past and has known is where the interrogation techniques or the
> interview techniques that were under scrutiny were ones where the
> actual interview itself was being sought to be placed into evidence.   So
> that was the basis on my ruling for denying your motion to appointment
> of the expert and it would also be my rationale for denying the motion
> for a continuance.

(App. D at 2–3).   The court stated that if the defense sought to admit the audio

recording of the mother's second interview in its case in chief, the court would

conduct a hearing on the issue of admissibility at that time.   The court proceeded

with jury selection (App. E at 3–90).

Burns' jury trial commenced the next day, on August 7, 2012 (App. E at 91).

Prior to the taking of testimony, defense counsel raised the issue of the admissibility

of the recording of the mother's second interview (*id.* at 107–08).   The State

opposed admission of the recording on the ground that most of it consisted of T.V.

screaming and crying, and the remainder was largely unintelligible (*id.* at 109).   The

court listened to the recording (*id.* at 113–16).

The court reporter transcribed the recording but indicated in the transcript that

it was "uncertified" (App. E at 113).   The court reporter also indicated in the

transcript that the recording was "unintelligible" and included "a lot of screaming"

(*id.*).

The uncertified transcript of the recording was the following:

THE CHILD:   No.

(Unintelligible)

THE CHILD:   No.

(Unintelligible)

THE CHILD:   No.

(Unintelligible)

THE CHILD:   No; no.

(Unintelligible)

THE CHILD:   No.

(Unintelligible)

THE CHILD:   I don't know.

(Unintelligible)

THE CHILD:   No.

(Unintelligible)

THE CHILD:   No; no.

(Unintelligible)

MS. HERRICK:   Did it hurt?

(Unintelligible)

THE CHILD:   No.

(Unintelligible)

THE CHILD:   Dark.

(Unintelligible)

THE CHILD:   Come out.

(Unintelligible)

THE CHILD:   No.

(Unintelligible)

THE CHILD:   I don't know.

(Unintelligible)

THE CHILD:   Yes.

(Unintelligible)

THE CHILD:   Yes.

MS. HERRICK:   Okay.

(Unintelligible)

THE CHLID:   No.

(Unintelligible)

THE CHILD:   I don't like—

(Unintelligible)

THE CHILD:   Yeah.

(Unintelligible)

THE CHILD:   He said he can't help it.

(Unintelligible)

MS. HERRICK:   All right.

THE CHILD:   Yeah.

(Unintelligible)

THE CHILD:   Yes.

(Unintelligible)

THE CHILD:   Yes.

(Unintelligible)

MS. HERRICK:   Out of tee-tee?

THE CHILD:   Yeah.

(Unintelligible.)

MS. HERRICK:   Tee-tee?

THE CHILD:   Yes.

(Unintelligible.)

MS. HERRICK:   How?

(Unintelligible)

Right?

(Unintelligible)

You've been a brave girl.   You've been a brave little girl.

(Unintelligible.)

THE CHILD:   I'm—

(Unintelligible)

MS. HERRICK:   Okay.   That's all I have today.   That's all I have today.

(Unintelligible)

We're all proud of you.

(Unintelligible)

Yesterday.

(Unintelligible)

You're a good girl.   You're a good girl.   You're a good girl.

(Unintelligible)

You're a good girl.

(Unintelligible)

Ice cream.

(Unintelligible)

All right.   That's all.

(Unintelligible)

Al right.   that's all.

(Unintelligible)

Okay?

(Unintelligible)

Okay.   All right.   You're a good girl.

(App. E at 113–16).

Defense counsel argued that he was not seeking to admit the recorded statements for their truth, so they were not hearsay (App. E at 116).   The court inquired:

> THE COURT:   Well, what are you offering it for?
>
> MR. LEVY [defense counsel]:   It's suggestive questioning.   If you look at her first—
>
> THE COURT:   Well, can't you—listen to me just a second. Can't you ask the lady about that on cross-examination?   I can't think of the—the—

MS. LIEB [the prosecutor]:   Ms. Herrick.

THE  COURT:   Ms. Herrick; can't  you  ask  her  about  these questions that she asked?

MR. LEVY:   I think this is the best evidence.   I mean if—I have already asked her about these questions.   And then she said—at least as far as did she offer ice cream and she testified right here that she did not.   It's clear on the—

THE COURT:  Okay.  Well then, obviously, there—that part of the tape would be able to come—If she testifies to anything that is inconsistent that's on that tape, then I will agree that you would be allowed to use that for rebuttal purposes, whether or not it's hearsay or not.

Would you agree with that, Ms. Lieb?

MS. LIEB:  Yes, sir.  But I want it clear that what Mr. Levy is representing,  she  didn't  from  the  hearing  the  other  day,  she  didn't testify that she didn't say that.   She didn't recall.

MR. LEVY:   That's right.   But—

THE COURT:   All right.

MR. LEVY:   To me it goes to the heart of our entire allegations, which is she continues to praise the child.  If you look at all the improper interview techniques, they're all there.   So I don't even care what answer the child gives because the child is all over the map.   It— It's the questions that I'm concerned for.

THE  COURT:   And here's  the  thing  that  I'm  telling  you: Here's what I'm going to allow; this is my ruling.  I'm not going to allow the tape to be played at this time.   However, if—when she gets on  the  stand,  I'm  going  to  give  you  some  latitude  on  your  cross-

examination on what you can ask her about this interview and the things
that she asked and the reason that she asked those things. And if she
testifies inconsistent with any of the things that are on this tape, then—
then, of course, you would be able to use that for rebuttal. Okay?

MR. LEVY: Okay.

THE COURT: But just playing that whole tape clearly is
inadmissible. Okay. All right. That's the Court's ruling.

(App. E at 117–19). Defense counsel argued that the whole recording was relevant

and admissible, because the child changed her answers during the second interview

based on the responses her mother gave (*id.* at 119). The court did not change its

ruling.

After the State rested its case, defense counsel renewed his motion to admit

the entire audio recording of the mother's second interview (App. E at 251). The

following discussion occurred:

MR. LEVY: I understand it's hearsay in here, but I'm not
admitting it for the purpose of the truth of the hearsay items in here.
Throughout it, the child is inconsistent as to what happened. Initially
she's saying no; then she's saying yes. So we wish to play it—

THE COURT: You wish to play it as to rebuttal?

MR. LEVY: I wish to play it in rebuttal, just to show that there
were a bunch of repeated questions. And I don't think I was able to
adequately get this information across to the jury because even after we

tried to refresh her [Ms. Herrick's] recollection, she was still saying that it's inaudible. And I think—you heard the tape and there's certainly numerous audible portions that outweigh the inaudible portion.

THE COURT: Well, I have to say a lot of it I couldn't hear, but some of it I could hear. And there may be some statements on there that would be suitable for rebuttal and so—You know, it's something that the State and the Defense is probably going to have to go through and decide what—what is rebuttal and what's not, because a lot of it is not admissible. But the portions that are—specifically as to the questions that were asked of this witness, when she said she didn't recall, some of those clearly—the Court heard some of those. So I—I think that there are some things there that could be rebuttal and I think the jury would be entitled to hear it.

(App. E at 251–52). The State did not object to playing the entire recording of the mother's second interview (*id.* at 252–53).

The recording was published to the jury (App. E at 256–59). The transcription of the recording is "uncertified," and included essentially the same words and phrases as the transcription set forth *supra*, except there was no transcribed reference to ice cream (*id.* at 256–59).

On direct appeal, the sole issue presented by Burns' appellate counsel was that the trial court reversibly erred by denying the defense's motion for determination of indigency for costs and motion for continuance to hire an expert (App. J at 24–36). Burns' appellate counsel argued that the issue was a purely legal question subject to de novo review (*id.* at 24). Counsel argued that the trial court's rulings were

erroneous for two reasons (*id.* at 25–36).   First, the court's rulings were based upon its belief that the recording would not be offered by either party, despite defense counsel's stating that the defense intended to offer it into evidence.   Second, the trial court incorrectly distinguished the present case from the two cases cited by defense counsel, *Harrison* and *Jenkins.*   Counsel argued that the trial court's errors deprived Burns of his constitutional right to due process and a fair trial (*id.* at 32).[4]

In its answer brief, the State argued that there was no need to reach Burns' constitutional claim, because defense counsel's motion for determination of indigency for costs was facially insufficient (App. K at 9–11).   The State argued that Burns' trial counsel failed to allege facts suggesting that Burns qualified for indigency under state law (*id.*).   The State additionally argued defense counsel failed to offer any specific information about the availability of an expert who could opine about suggestive techniques or questioning when interviewing an autistic child (*id.*).

---

[4] In Burns' section 2254 petition, he asserts that not only did he present Ground One on direct appeal, but he also presented it in his state habeas petition alleging ineffective assistance of appellate counsel (IAAC) (*see* ECF No. 1 at 12).   The state court record conclusively refutes any claim that appellate counsel failed to present Ground One on direct appeal.   Therefore, to the extent Burns presents an IAAC claim here in addition to a due process or fair trial claim, it is entirely without merit.

The State alternatively argued that if Burns' constitutional claim was reached, it must be rejected (App. K at 11–12). The State maintained that there was no procedural due process violation, because state law provided a procedural mechanism for requesting appointment of an expert based upon partial indigency, but Burns failed to comply with that mechanism (*id.*). The State argued that substantive due process did not require the State to pay for an expert simply because the defense wanted one, citing *Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52 (2009) (*id.* at 12). The State further argued that the absence of a defense expert did not render Burns' trial unfair, because without a description of the substance of an expert's testimony, it cannot be said that such testimony went to the heart of his defense (*id.* at 12–15). Finally, the State argued that any trial court error was harmless, because the absence of an expert did not hamper Burns' ability to develop his defense (*id.* at 15–18).

The First DCA issued a one-word decision, "Affirmed" (App. L).

"[T]he summary nature of a state court's decision does not lessen the deference that it is due." *Wright v. Moore*, 278 F.3d 1245, 1254 (11th Cir. 2002); *see also Richter*, 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court

adjudicated the claim on the merits in the absence of any indication or state law procedural principles to the contrary."). Where a state court denies relief without providing an explanation or its reasoning, the habeas petitioner must show that there was no reasonable basis for the state court's decision. *See Richter*, 562 U.S. at 98. The federal court must determine what arguments or theories supported or could have supported the state court's decision, and then ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court. *See Richter*, 562 U.S. at 102.

However, where there is a related state court decision that **does** provide a relevant rationale, the federal court should "look through" the unexplained decision to the last related state court decision. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). The federal court should then presume that the unexplained decision adopted the same reasoning. *Id.*

The question for this federal court is whether the state court's denial of the defense's request for a continuance and public funds for an expert—where the defendant did not show he had found an expert who was available and willing to provide substantially favorable testimony—was contrary to or an unreasonable

application of the holding of a Supreme Court case. No Supreme Court precedent establishes that denying a continuance and public funds under those circumstances renders a trial fundamentally unfair.

Denial of a continuance rises to the level of a constitutional violation only if it is so arbitrary as to violate due process. *See Morris v. Slappy*, 461 U.S. 1, 11–12 (1983). "Not every restriction on counsel's time or opportunity to investigate or to consult with his client or otherwise to prepare for trial violates a defendant's Sixth Amendment right to counsel." *Id.* at 11 (citing *Chambers v. Maroney*, 399 U.S. 42, 53–54 (1970)). "[O]nly an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to assistance of counsel." *Id.* at 11–12 (quoting *Ungar v. Sarafite*, 376 U.S. 575, 589–90 (1964))

In *Ungar*, the Supreme Court held that the trial court's denial of the defendant's motions for continuance—for counsel's additional preparation and for the defendant to obtain medical proof and expert testimony—did **not** violate the defendant's due process rights. 376 U.S. at 590–91 (emphasis added). The Court stated that there were no tests for determining whether a "denial of a continuance is

so arbitrary [that it] violate[s] due process," and that the determination must be based on the circumstances of each individual case.    *Id.*

Because *Morris* and *Ungar* announced a general rule, the state court had "more leeway" in denying Burns' due process claim.    *See Evans v. Sec'y, Dep't of Corr.*, 703 F.3d 1316, 1326 (11th Cir. 2013) (explaining that the more general the rule announced by the Supreme Court, the "more leeway courts have in reaching outcomes in case-by-case determinations." (quotation omitted)).[5]

Here, Burns' counsel stated he received the audio recording of the mother's second interview on July 3, 2012 (*see* App. A at 66, App. B at 27).    Defense counsel did not raise the issue of obtaining an expert until four weeks later, on July 31, 2012, when counsel mentioned he wanted to talk to Burns "about possibly getting an

---

[5]   The court is aware of a decision by the Fifth Circuit in *Hicks v. Wainwright*, 633 F.2d 1146 (5th Cir. Unit B Jan. 1981), which relied on *Ungar* to hold that the denial of the petitioner's motion for continuance to present critical defense testimony amounted to a violation of due process.    The *Hicks* court applied a multi-factor test from prior precedent for determining whether the denial of a request for a continuance was an abuse of discretion.    *See Hicks*, 633 F.2d at 1147 (citing *United States v. Uptain*, 531 F.2d 1281 (5th Cir. 1976)).    The Supreme Court, however, has made clear that courts may not rely on circuit precedent when determining the reasonableness of a state court's decision.    *See Parker v. Matthews*, 567 U.S. 37, 48–49 (2012) ("[C]ircuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court.'").    Therefore, circuit court precedent cannot form the basis for habeas relief under the AEDPA.    *See id.*; *see also, e.g., Himes v. Sec'y, Fla. Dep't of Corr.*, 690 F. App'x 640, 646–47 (11th Cir. 2017) (unpublished but cited as persuasive authority) (holding that district court erred in relying on *Hicks* and *Uptain* to determine that Florida appellate court unreasonably applied *Ungar* by affirming trial court's denial of defendant's motion for continuance to locate sole alibi witness).

expert, getting him declared indigent and a motion for partial indigency to try and get the expert" (*id.*).   The trial court reminded counsel that the trial was scheduled for the following week (*id.*).   Defense counsel responded that he was "potentially" going to request a continuance (*id.*).

As previously noted, defense counsel filed a written motion for continuance on August 6, 2012, the day of jury selection (App. A at 66–69).   Counsel asserted that regardless of the court's indigency determination, due process required that the defense be afforded additional time "to have the opportunity to obtain an expert regarding the suggestive interviewing techniques employed by Candace Herrick and the impact those suggestive interviewing techniques had on the alleged victim's allegations" (*id.* at 69).

Burns' counsel did not assert he had found an expert who was available to evaluate the recording of the mother's second interview and willing to offer substantially favorable testimony.   Indeed, Burns' counsel did not assert he had made **any** effort to find an expert during the month he had known about the recording.

Put simply, because the Supreme Court's cases give no clear answer to whether the denial of a continuance and funds for an expert, under the circumstances

Burns alleged, rendered his trial fundamentally unfair, it cannot be said that the state court unreasonably applied clearly established Federal law.   *See Woods v. Donald*, 575 U.S. 312, 317 (2015) ("Because none of our cases confront the specific question presented by this case, the state court's decision could not be contrary to any holding from this Court.") (internal quotation marks and citation omitted); *Wright v. Van Patten*, 552 U.S. 120, 125–26 (2008) ("Because our cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established federal law.") (internal quotation marks omitted); *Schriro v. Landrigan*, 550 U.S. 465, 478 (2007) (state court did not unreasonably apply federal law because "we have never addressed a situation like this"); *Carey v. Musladin*, 549 U.S. 70, 77 (2006) ("Given the lack of holdings from this Court regarding the potentially prejudicial effect of spectators' courtroom conduct of the kind involved here," the denial of relief by the state court "was not contrary to or an unreasonable application of clearly established federal law.").  Burns is not entitled to federal habeas relief on Ground One.

### B.    Ground Three[6]:   "Petitioner Paul Burns avers the trial court must allege each essential element of the alleged crime to be valid (due process)

---

[6]  For organizational purposes, the court has consolidated its discussion of some of Burns' claims, and discussed them in a different order than he presented them in his § 2254 petition.

**statutes [sic] are to be strictly construed against the State and most favorable to the accused."**

**Ground Seven:   "The evidence in this case is totally insufficient as a matter of law to establish the commission of the crime charged.   The trial court abused its discretion placing [sic] a judicial thumb on the scales of justice by allowing presentation of evidence that altered the juries [sic] compassion when hearing the facts of the case.   Evidence based on false assumptions, mistaken assumptions of the credibility or truthfulness of a mentally challenged child diagnosed with autism and prevasive [sic] development disorder, and of inadmissible lay witness testimony of not one but two witnesses in support thereof, as the actual events [sic], prejudicially changing the outcome of the case.   In view of the absence of competent substantial evidence, no reasonable jury could have found guilt based on such interferences.   A denial of due process being [sic] convicted of the crime charged based on legally insufficient evidence to sustain the State [sic] met its burden to prove guilt beyond a reasonable doubt."**

In Ground Three, Burns alleges the State failed to prove each essential element of the offense beyond a reasonable doubt (ECF No. 1 at 29–33).   Burns alleges the charging information alleged he placed his tongue on T.V's vagina between February 1, 2011 and August 24, 2011 (*id.*).   Burns alleges during trial, T.V. repeatedly responded "No" when the prosecutor asked whether Burns ever used his tongue to lick her tutu (*id.*).   Burns alleges the State thus failed to prove that his mouth had union with T.V.'s sexual organ (*id.*).   Burns also alleges T.V. testified at trial that the alleged sexual battery occurred on May 12, 2009; therefore, the State failed to prove that the offense occurred during the time frame alleged in the

information (between February 1, 2011 and August 24, 2011) (*id.*).   Burns contends

the evidence was thus insufficient to sustain his conviction (*id.*).

In Ground Seven, Burns asserts the trial court erred by "invoking a legally

insufficient analysis" for determining whether there was sufficient evidence to

sustain the conviction (ECF No. 1 at 63).   Burns asserts if the trial court had utilized

a proper analysis at the close of the State's case, it would have determined there was

not competent, substantial evidence of his guilt, and that the evidence failed to

exclude every reasonable hypothesis of his innocence (*id.* at 64).   Burns alleges

T.V. was not competent to testify due to her mental and developmental disability,

and the trial court erred by overruling defense counsel's objection to T.V.'s

competency (*id.* at 65–69).   Burns alleges T.V.'s statements were the only evidence

presented by the State to prove his guilt, and because T.V. was not competent to

testify, there was insufficient evidence to support his conviction (*id.* at 69–70).

Burns alleges any competent appellate attorney would have briefed the issue of the

insufficiency of the evidence on direct appeal (*id.* at 69).

Burns states he did not present these issues on direct appeal because his

appellate counsel failed to do so (*see* ECF No. 1 at 28 (as to Ground Three), 71 (as

to Ground Seven)).    Burns states he presented his claims in his state habeas petition alleging ineffective assistance of appellate counsel.

The State asserts Burns presented these arguments in Issue Two of his amended habeas petition alleging ineffective assistance of appellate counsel (ECF No. 24 at 33–36, 72–75).    The State contends Burns has not shown that the First DCA's denial of the claims was contrary to or an unreasonable application of clearly established federal law (*id.* at 34–54, 76–85).    Additionally, the State asserts Burns presented Ground Three as a claim of trial court error in his Rule 3.850 motion (*id.* at 34 n.3).    The State contends the state court determined that the claim of trial court error was procedurally barred as untimely under state law; therefore, the claim is procedurally barred on federal habeas (*id.*).

The state court record supports the State's exhaustion argument.    The record demonstrates that in Issue Two of Burns' amended state habeas petition alleging IAAC, Burns presented **verbatim** the claims he presents in Grounds Three and Seven of his § 2254 petition (*compare* ECF No. 1 at 29–33, *with* App. CC at 35–37; and *compare* ECF No. 62–70, *with* App. CC at 10–17).    The First DCA denied Burns' petition on the merits, without explanation (App. EE).

The state court record also demonstrates that in Ground Three of Burns' Rule 3.850 motion, he presented **verbatim** the claim he presents in Ground Three of his § 2254 petition (*compare* ECF No. 1 at 29–33, *with* App. HH at 28–32). The state circuit court denied Burns' Rule 3.850 motion as untimely and noted that Burns' claims of trial court error were not properly presented in a Rule 3.850 motion (App. HH at 88–91). The First DCA affirmed the circuit court's decision without comment (App. MM).

The court will first address Burns' IAAC claims and then his federal due process challenges to the state court's rulings on the victim's competency and the sufficiency of the evidence to support the conviction.

### 1.    IAAC Claims

### a.    Clearly Established Federal Law

The standard for evaluating a claim of ineffective assistance of appellate counsel is the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *See Smith v. Robbins*, 528 U.S. 259, 285 (2000) (citation omitted). The two components of an ineffectiveness claim under *Strickland* are performance and prejudice, and if an insufficient showing is made as to one, the court need not address the other. *Strickland*, 466 U.S. at 697.

The focus of inquiry under the performance prong of *Strickland* is whether counsel's assistance was "reasonable considering all the circumstances." *Strickland*, 466 U.S. at 691. Appellate counsel who file a merits brief need not (and should not) raise every nonfrivolous claim but, rather, may select from among them in order to maximize the likelihood of success of on appeal. *See Jones v. Barnes*, 463 U.S. 745, 753–54 (1983) ("Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues."). However, appellate counsel **is** expected to "select[] the most promising issues for review." *Id.* at 752.

To demonstrate prejudice, petitioner must show a reasonable probability that, but for his counsel's unreasonable failure to brief a particular issue, petitioner would have prevailed on appeal. *See Robbins*, 528 U.S. at 285. This inquiry "is not wholly dissimilar from the inquiry used to determine whether counsel performed deficiently in the first place; specifically, both may be satisfied if the defendant shows nonfrivolous grounds for appeal." *Roe v. Flores-Ortega*, 528 U.S. 470, 486 (2000).

"Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Richter*, 562 U. S. at 105. As the *Richter* Court explained:

> The standards created by *Strickland* and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.* (citations omitted).

### b.      Federal Review of State Court Decision

Burns presented the IAAC claims at issue here in Issue Two of his state habeas petition (App. CC at 10–40). The First DCA adjudicated the petition on the merits (App. EE).

As previously discussed, where a state court denies relief without providing an explanation or its reasoning, the habeas petitioner must show that there was no reasonable basis for the state court's decision. *See Richter*, 562 U.S. at 98. The federal court must determine what arguments or theories supported or could have

supported the state court's decision, and then ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court.  *See Richter*, 562 U.S. at 102.

The Eleventh Circuit has issued several decisions interpreting the *Strickland* standard regarding claims of ineffective assistance of appellate counsel.  Where an issue is not preserved for appellate review, appellate counsel's failure to raise the issue is not constitutionally deficient as it is based on the reasonable conclusion that the appellate court will not hear the issue on its merits.  *See Diaz v. Sec'y Dep't of Corr.*, 402 F.3d 1136, 1142 (11th Cir. 2005); *Atkins v. Singletary*, 965 F.2d 952, 957 (11th Cir. 1992); *Francois v. Wainwright*, 741 F.2d 1275, 1285–86 (11th Cir. 1984). Additionally, appellate counsel cannot be deemed ineffective for failing to raise issues "reasonably considered to be without merit."  *United States v. Nyhuis*, 211 F.3d 1340, 1344 (11th Cir. 2000) (internal quotation marks and citation omitted). But "[w]here . . . appellate counsel fails to raise a claim on appeal that is so obviously valid that any competent lawyer would have raised it, no further evidence is needed to determine whether counsel was ineffective."  *Eagle v. Linahan*, 279 F.3d 926, 943 (11th Cir. 2001).

To determine whether the failure to raise a claim on appeal resulted in prejudice, the federal court must review the merits of the omitted claim.   *Eagle*, 279 F.3d at 943.   If the court concludes that the omitted claim would have had a reasonable probability of success, "then counsel's performance was necessarily prejudicial because it affected the outcome of the appeal."   *Id.*

Here, the claims at issue were preserved for appellate review, so the question turns on whether the unbriefed claims had merit.   To assess the reasonableness of the First DCA's determination that Burns' IAAC claims had no merit, this court must consider the evidence adduced at trial.

The State presented testimony from T.V.'s mother, Ms. Herrick (App. E at 133–41).   Ms. Herrick testified that T.V. was currently eleven years old and diagnosed with autism "on the lower end of the spectrum," meaning, she functioned better than most autistic children (*id.* at 134).   Ms. Herrick testified her husband (who is T.V.'s father) met Burns five or six years ago, and she and her husband considered Burns to be their best friend (*id.* at 135).   Ms. Herrick testified Burns spent holidays with them, and he spent time with T.V. (*id.* at 135–36).   Herrick testified Burns was alone with T.V. "quite often" (*id.* at 136).   She testified Burns

sometimes picked T.V. up from school or her grandparents' house and took her shopping at the grocery store and the mall (*id.*).

Ms. Herrick testified that in August of 2011, when T.V. was ten years old, T.V. walked into the kitchen with her shorts pulled down in the front, holding a rolled-up, elongated piece of Silly Putty next to her skin hanging down (App. E at 136–37). Ms. Herrick testified she told T.V. it was "gross" and not to ever do it again (*id.* at 137). Herrick testified she asked T.V. what it (the Silly Putty shape) was, and T.V. responded that it was a tail (*id.* at 137–38). Ms. Herrick explained that she and T.V.'s father used the word "tail" to refer to male genitals, when T.V. had accidentally walked in on her father in the bathroom when he was disrobed (*id.* at 138). Ms. Herrick testified that later that day, she asked T.V. if Burns had ever touched her or "done anything to her in her private parts" (*id.*). Herrick testified that T.V. said yes (*id.*). Ms. Herrick testified she told her husband what T.V. had said (*id.*).

Ms. Herrick testified that the next morning, she called a psychiatrist who had seen T.V. on one occasion (App. E at 138–39). Herrick testified she also called the police (*id.* at 139). Herrick testified she later took T.V. to speak with someone at the Children's Advocacy Center (CAC) (*id.*).

On cross-examination, defense counsel asked Ms. Herrick if she ever reinitiated questioning with T.V., after her initial questioning on the day of the Silly Putty incident (App. E at 146).   Ms. Herrick testified that her husband questioned T.V. the same day, and then she (Herrick) questioned T.V. the next morning, which she recorded with a tape recorder (*id.*).   Ms. Herrick testified T.V. was "very forthcoming" when she (Herrick) first questioned T.V.; that T.V. was "forthcoming" when T.V.'s father questioned her; and that T.V. was "angry" the second time she (Herrick) questioned her (*id.* at 147).

Defense counsel asked specific questions about what T.V. said during the second, recorded questioning, and Ms. Herrick responded that she did not recall (App. E at 148).   The trial court announced that Ms. Herrick would be required to refresh her recollection about the recorded questioning by listening to the recording outside the presence of the jury, and then defense counsel could continue questioning her on that subject (*id.*).

The prosecutor called T.V. to testify.   The prosecutor began her examination by questioning T.V. about her sense of obligation to tell the truth:

> Q.   Okay.   And Judge Wells just asked you, T[.V.], if you promise to tell the truth.   Do you know what the truth is?
>
> A.   What?

Q.  Okay.   Let me ask you a question, T[.V.].   Do you see that I'm wearing a jacket today?

A.  Uh-huh.

Q.  If I said that this jacket is red, would that be the truth or a lie?

A.  A lie.

Q.  A lie?   And why would—

A.  It's black.

Q.  That's right.   And if I said that your name is T[], would that be the truth or a lie?

A.  The truth.

Q.  And why would it be the truth?

A.  Because that's the—the correct name.

Q.  Okay.   Thank you, T[].   So you promise to tell us only the truth today?

A.  Uh-huh.

Q.  Okay.   Thank you.   And, T[], what's your favorite color?

A.  Pink.

Q.  Pink?   And is that the color you're wearing today on your dress?

A.  Uh-huh.

Q.  Okay.   And, T[], have you started back to school yet this year?

A.  No.   I have to do it in the 9th and the 10th.

Q.  The 9th and the 10th of August?

A.  Yeah.

Q.  Okay.   So you're getting ready to start school?

A.  Uh-huh.

Q.  And what grade will you be in?

A.  Fourth.

. . . .

Q.  Okay.  Thank you.   T[], do you know why you're here today?

A.  Because I have to tell the truth.

(App. E at 158–60).

The trial court granted defense counsel's request to voir dire T.V. on her ability to discern truth from lie:

Q [by defense counsel].  Okay.   And T[], do you remember what you got for Christmas last year?

A.  Well, actually, I'm getting a "Search for Santa Clause" DVD.

Q.  Now, I'm not talking about what's going to happen for this Christmas.   What—What did you receive last year for Christmas? What gifts did you receive?

A.  You'll see.   I have to admit (unintelligible) and people. Right?

Q.  I just want you to answer my questions, T[].   Can you clarify—can you—do you have—can you remember any gifts, even one gift, that you got last year for Christmas?

A.  Well, I've got a—a necklace, a peace sign necklace.

Q.  Okay.   And—and what day did you get that on?

A.  25th.

Q.  25th of which month?

A.  December.

Q.  Okay.   And have you talked with anybody about how you're to testify today?

A.  Uh-huh.

Q.  Okay.   And what were you told?

A.  Well, I was told to tell the truth.

Q.  Okay.   So did anyone tell you to say anything that didn't happen?

A.  Uh-huh.

Q.  You're shaking your head yes?

A.   Yep.

Q.   Okay.   What did someone tell you to say today that didn't happen?

A.   Well—

. . . .

　  Well, actually, sir, it was about that mean man, Uncle Pauly.

Q.   Okay.   And what did someone tell you to say?

A.   Well, my mother told me.

Q.   And what did your mother tell you?

A.   That Uncle Pauly was very, very ubiquitous.

Q.   Do you know what that word means?

A.   It means the same as—as—same as—and that's the word; what it means.

Q.   And what—how did you interpret that when she told you that—that Uncle Pauly was ubiquitous?

A.   Because he did the disgusting things that he did.

Q.   Okay.   But you said your—your mom told you—told you to say something that didn't happen.   What was that that she told you to say that didn't happen?

A.   Well, it means that Uncle Pauly was really ridiculous. That's because he just did some—some nasty things.

Q.   But did your mom tell you to say anything?

A.  Well, uh-huh.

Q.  Okay.  So when you're saying your mom told you to say something, that's the truth?

A.  That's the truth.

Q.  Okay.  But you're having trouble recollecting or remembering what she told you?

A.  Well, I haven't been doing this right.  But—But Mom thinks that I didn't have control.  I'm perfectly fine I think.

Q.  I don't think I understand you, T[].  Can you explain to me what you are saying?

A.  Well—Well, I didn't have some trouble remembering because I just—I was just perfectly fine.

Q.  So you're just perfectly fine?

A.  Uh-huh.

(App. E at 160–64).

Defense counsel challenged T.V.'s competency to testify (App. E at 165).

The court granted the prosecutor's request to examine T.V. further:

Q.  T[], you said something about the movie, "The Search for Santa Claus."  Have you ever seen the movie, "The Search for Santa Claus"?

A.  No; no; no; no, I haven't seen that.

Q.  Have—Have you ever watched the movie on T.V.?

A.  Huh-uh.

Q.  Okay.   Now, you said to Mr. Levy that your mom had told you to say something?

A.  Yeah.

Q.  Did your mom tell you to tell the truth?

A.  Uh-huh.

Q.  Yes?   Okay.   And did she tell you to tell the truth when you came in here today?

A.  Yeah.

Q.  Okay.   And do you remember meeting me before?

A.  Yes.

Q.  Okay.   And you remember telling Mr. Levy and me what Uncle Pauly had done?

A.  Right.

Q.  Okay.   And you promised to tell the truth about that in here today?

A.  Yes.

(App. E at 165–66).   The trial court overruled defense counsel's challenge to T.V.'s

competency (*id.* at 166).

The prosecutor began by noting T.V.'s earlier statement that "Uncle Pauly was mean" and asked T.V. why she thought he was mean (*id*.).  T.V. answered, "Well, he's a man; he has a mustache and it's gray." (*id*.).  The prosecutor then asked T.V. if she saw Uncle Pauly in the courtroom, but T.V. said she did not see him (even after she was told she could stand up and look around) and thus did not identify him as the man she knew as Uncle Pauly (*see id*. at 166–67).  T.V. then testified that "Uncle Pauly" did some things to her, and when the prosecutor asked what he did, T.V. responded, "He touched my tutu." (App. E at 167).  T.V. identified her "tutu" by pointing downward (*id*. at 167–68).  T.V. described her "tutu" as the part of her body that she "pee peed" from (*id*. at 168).  T.V.'s trial testimony continued:

> Q.  And, T[], when you said that Uncle Pauly touched your tutu, what did he touch your tutu with?
>
> A.  His tail.
>
> Q.  His tail?  Okay.  And what part—was there any other part that uncle Pauly used to touch your tutu?
>
> A.  Well, yes.
>
> Q.  Okay.  And what was that?  It's okay.  You can answer it.
>
> A.  He put it in—put his—put his tail under my tutu.  Because he did—something really, really, really nasty happened.

Q.   Okay. And what nasty happened?

A.   Well, I was embarrassed by him.

Q.   Okay. Well, what did he do that made you embarrassed?

A.   Because I had clothes on and I had a little dress on.

Q.   Okay.   Now, did Uncle Pauly ever touch your tutu with his hand or with his tongue or something else?

A.   No; no; no; no.   His tail.

Q.   Just his tail?   Okay.   Did Uncle Pauly ever rub your tutu or lick your tutu or something else?

A.   He just licked it.

Q.   He licked it?   Okay.   And what part of Uncle Pauly's body did he use to lick your tutu?

A.   Well, he did that with his tail instead of his hand.

Q.   Instead of his hand?   Okay.   Did he ever use his tongue to lick your tutu?

A. No; no; no; no; no; no; no.  I don't think so.  He used his hand and his tail instead of his little tongue.

Q.   Okay.   Did you ever see Uncle Pauly's tongue?

A.   Oh, no; no; no; no ; no, I haven't seen that.

Q.   Okay.   T[], did Uncle Pauly ever do anything else to you?

A.  Well , he didn't do anything else.   He—he—he can't help himself.   That's what he said; that.

Q.   Okay.   And are you sure that Uncle Pauly touched your tutu?

A.  Yes; yes; yes.

Q.  Okay.   That really did happen?

A.  Uh-huh, it really did happen.

Q.  Okay.   And do you remember where you were at [sic] when Uncle Pauly touched your tutu?

A.  In school.

Q.  In school?  Okay.  And when Uncle Pauly touched your tutu, how did that make you feel?

A.  Embarrassed.

Q.  Embarrassed?

A.  Uh-huh.

Q.  Okay.  And you said that Uncle Pauly didn't do anything else?   Did he touch any other part of your body?

A.  No; no; no; no; no; no; no; not exactly.   But he was being mean.

Q.  He was being mean?

A.  Uh- huh.

(App. E at 168–70).

On cross-examination, defense counsel began his questioning by asking T.V.,

"[D]o you remember if you ever told someone that you had never seen a tail?" (App.

E at 171).   The examination proceeded as follows:

>    A.   No; no; no; no; no.   I haven't—I haven't told this yesterday, but I think I had last—last—last month or—or—

>    Q.   You saw a tail last month?

>    A.   In—in May the 12th.

>    Q.   May—May 12th of what year?

>    A.   2009.

>    Q.   And whose tail did you see on May 12th, 2009?

>    A.   Mean Uncle Pauly's.

>    Q.   And where did that occur?

>    A.   On Wednesday.

>    Q. When I say "where," what I mean is the location.   Do you understand what I'm asking you?

>    A.   Uh-huh.

>    Q.   Okay.   Can you tell me where it happened; where you were at?

A.  Well, I was at—at his garage.   And he did something really nasty.

Q.  Okay. And can you describe the garage for me?

A.  Sure.

Q.  Okay.   Tell me—tell me—tell me about the garage.

A.  Well, it's large and it had a big, tall school; school.   And Uncle Pauly has an office.   And he has a big black car, but we don't know what kind of black car does he have [sic].   But it's not a '57 T-Bird.

Q.  Okay.   And how are you so certain that it happened on May 12th, 2009.

A.   Because—because Uncle Pauly—well, he was a stranger because he tried to trick me.

Q.  How did he try and trick you?

A.  Because he tried to catch me with his hands.   And I was just screaming for my mommy and daddy.

Q.  And where—where did he try and catch you with his hands?

A.  At the street.   It was cars [sic] were blocked.

Q.  So was there a traffic jam?

A.  Yeah.   But there were 1988 cars.

Q.  How did you know there were that many cars?

A.  Well, because there's a lot of people.

Q.   So there were a lot of people around when this happened?

A.   Well, there are 349 of them.

Q.   Okay.   And back to the garage, when you say it happened on May 12th, 2009.   Do you know what you were doing on May 13th, 2009?

A.   Well, actually, I was just—I was just feeling a little—little shocked about it.

Q.   Okay.

A.   Like it was a bad dream.

Q.   On that day?

A.   Uh-huh.

Q.   And do you know if you—if you did anything special on May 13th, 2009?

A.   Well, I just—just told my dog, Gracie, about—about it.   It was—it was just a bad dream.

Q.   So you think this might all be a bad dream?

A.   Uh- huh.

Q.   Okay.   And you said you were speaking to your dog, Gracie?

A.   Yeah.   She's white.

Q.   Okay.   And does she speak to you?

A.  No.  She just—just holds—she just lifts her paw and holds my hand; my left hand.  She did—she lifts—lifts her paw that is the right paw and she holds my left hand.  Gracie the dog did that.  And actually, I was taking care of that.  And I was so sorry.

Q.  Okay. I want to go back to—

A.  What?

Q.  —to the garage.  Do you—do you know what county we're in right now?

A.  Well—

Q.  Do you know what county this courthouse is in?

A.  Well, it's—isn't that when Uncle Pauly did something really, really nasty and uncomfortable?

Q.  I just want you to answer my question.

A.  Huh?

Q.  Do—do you know what county this courthouse is located in?

A.  Well, we don't know what it means; means [sic].  It's really just tough.

Q.  What's tough about it?

A.  About when we don't know what ubiquitous means.

Q.  Okay.  And when you don't know things, do people tell you; do people help you?

A.  Yes.

Q.  Who; who mainly helps you?

A.  My mommy and daddy.

Q.  Okay.   Do they ever tell you to say certain things?

A.  Yes.

Q.  Okay.  Can you tell me—can you give me an example of something they told you to say?

A.  Well, they told me, You don't pay attention to Uncle Pauly; just ignore him.

Q.  Okay.   And have they ever said anything else about Uncle Pauly to you?

A.  Well—Well, they said that Uncle Pauly has to get to a jail cell.

Q.  Okay.  And did your mom go over any questions about what might happen here today?

A.  Yeah, she did that; correctly.

Q.  She did do that?   And did she tell you to do anything other than say the truth?

A.  Well, not exactly.  But she did that at—she did that very correctly.

Q.  Can you—can you explain that to me?   What—what did she do correctly?

A.   Well, she—she told me to ask some questions at home because—because they decided to—to tell me the truth.

Q.   They told you the truth?

A.   No; no; no; no; no; no.   It wasn't—it was me, except the people.   But—but I did tell the truth; I told the truth to my mother and father correctly.   And it does make sense.

Q.   Why does it make sense?

A.   Well, naturally, when I—after I told the truth to my mommy and daddy, I just—just found out that Uncle Pauly had disappeared.

(App. E at 171–75).

Defense counsel asked T.V. if she ever told anybody else another story about what Uncle Pauly did to her (App. E at 176).   T.V. responded, "No." (*id.*).   Defense counsel then asked T.V. the same question but in a different way, which ultimately led to T.V. stating she told her mother and father that Uncle Pauly was "being so, so gross" (*id.*).

Defense counsel asked T.V. whether she remembered playing with Silly Putty in May of 2012 (App. E at 176–77).   T.V. responded that she made silly, funny shapes with it (*id.*).   Counsel asked, "[D]o you ever do anything with the Silly Putty?" (*id.* at 177).   T.V. responded that she didn't do anything; she "just pet my kitty cat, Mia" (*id.*).

Defense counsel then steered the questioning back to the "traffic" that T.V. mentioned earlier (App. E at 177).   T.V. testified she "got hurt by getting run over by a . . . '57 T-Bird" (*id.*).   Defense counsel asked if it hurt her, and T.V. responded, "No.  Just Uncle Pauly.  It did not hurt me.  It just kissed me. . . .   On my foot" (*id.*).  Defense counsel continued:

> Q.  Okay.   And what you just told me, is that a truth?
>
> A.  Yes.
>
> Q.  Okay.   So when you say you got hit by a Chevy, that's the truth?
>
> A.  No; no; no; no; no; no; no.   I didn't get hit.   I got kissed.
>
> Q.  Oh, the Chevy kissed you?
>
> THE COURT:   It's a Thunderbird she said.
>
> MR. LEVY:   Oh, I'm sorry.
>
> THE COURT:   It was a Thunderbird.
>
> MR. LEVY:   Okay.
>
> Q.   And when the—when the car—you said it kissed you. Where did the car kiss you?
>
> A.   By the—on my left back, after the side [sic].   He—but his car was made in 1953.   And they said I hit the left side of the corner.
>
> Q.   Okay.

(App. E at 177–78).

Defense counsel also questioned T.V. about statements she made in her deposition:

> Q.   Okay.   T[], I'm going to ask you a question.   Do you remember when me, you, and Ms. Lieb sat down at a table and we talked about Uncle Pauly and this case?
>
> A.   Yes.
>
> Q.   Okay.   And I asked you questions and you answered the questions?
>
> A.   Uh-huh.
>
> Q.   Okay.   And did you answer those questions truthfully?
>
> A.   I did those correctly enough.
>
> Q.   Okay.   And you told us at that time that you were going to tell the truth when you answered my questions.
>
> A.   That's right.
>
> Q.   Okay.   And did you tell me that there were other people present when Uncle Pauly touched you?
>
> A.   Oh, no; no; no; no; no.   They didn't play with me.   They judged me.
>
> Q.   What do you mean judged you?

A.   Well—well, they told me to ask some very truthful questions because I've been told to tell the truth.

Q.   Okay.   Who—who told you; who told you that?

A.   My mother and father.

Q.   Okay.   And—and did they tell you to say anything regarding what Uncle Pauly might have done to you?

A.   Yeah.   They did that at my grandmother's.

Q.   They did do that at your grandmother's?   What—what did they tell you?

A.   Because Uncle Pauly acts really mean and greedy.   Because he's a stranger and a stalker.

Q.   Do you know what a stalker is?

A.   Well, actually, people, a stalker is—is a—is a gross and uncomfortable stranger.

Q.   And where did you learn that definition from?

A.   Out of my brain.

Q.   So nobody told you about that?

A.   No; no; no; no; no; no; no.   They—They—No one did not tell me.   I decided to just tell the truth to my mother and father at my grandmother's house and so I did tell the truth.   But Uncle Pauly was fired.

Q.   Okay.   One of the things that—that you told me is you told the truth when we sat down—Ms. Lieb and me and we talked about

what happened.   You told me you told the truth that day as well; correct?

A.  Yes.

Q.  Okay.   And did you tell me that there was a girl by the name of Mary who was 12 years old and she was at the school when Uncle Pauly touched you?

A.  Well—Well, her name is Rebecca and she's born in March the 4th, 1991.

Q.  Okay.  Did you tell me about Amy, who was seven years old—

A.  Yeah.

Q.   —who was there?

. . . .

[D]id you tell me that there was a nine-year-old by the name of Dilsy that also was there when Uncle Pauly touched you?

A.  Well, Amy is seven years old and she's born January the 25th, 1968. And Dilsy—and how old is Dilsy?  Oh, she's nine years old and she was born in July the—the 12th, 1977.

Q.  Okay. And that—that's the truth?

A.  Yes, that's the truth, sir.

Q.  Okay.   And did anything happen with Uncle Pauly while you were in his car alone with him?

A.  Well, I—I did that at his school because he tried to catch me with his—with his—with his little old hand when he did like that.

Q.  Were you playing a game?

A.   Well—well, yeah.   He did something really horrible and terrifying because he was making me embarrassing [sic].   Because—because I told the truth to my mommy and daddy and then—then Uncle Pauly is fired from taking his job by [sic] taking care of me.

Q.   Okay.   And who told you Uncle Pauly was fired?

A.   Well, Momma and Daddy.

Q.   Okay.   And you talked about being in the car with Uncle Pauly?

A.   Well, yeah.   And his car is not a '57 T-Bird.   It's a '29 T-Bird.

Q.   Okay.   And did Uncle Pauly—he didn't touch you in the car?

A.   No.   Because he did that at the—at the traffic jam because I saw that purple '57 T-Bird that was made in 1992.

Q.   Okay.   And do you—do you remember talking with your mom when she had a tape recorder?

A.   No; no; no; no; no; no; no; no, sir.   I didn't talk to her because my daddy told me that Uncle Pauly was a—was a gross and uncomfortable person and he was wrong.
. . . .
Q.   During—during that deposition that I was talking about, did you ever ask me if your answer was correct?

A.   Yes; yes.

Q.   And why did you ask me that?

A.   Because Uncle Pauly was a mean man.

Q.   Then why would you ask me if the answer was correct?

A.   Because I didn't say that correctly because Uncle Pauly was going to be in prison.

(App. E at 178–83).

On re-direct examination, the prosecutor again asked T.V. about what Uncle Pauly did:

Q.   T[], you said Uncle Pauly is a mean man and did gross things to you; right?

A.   Uh-huh.

Q.   Okay.   And what were the gross things that he did to you?

A.   Well, he touched my tutu; he catched [sic] me on the road because I saw that purple '57 T-Bird.   But it didn't catch me.   But the purple '57 T-Bird did not catch me.   Uncle Pauly did, instead of the purple '57 T-Bird.

Q.   Okay.

A.   But the '57 T-Bird was purple and it kicked me on my right toe.

Q.   Okay.   And, T[], you said Uncle Pauly touched you on your tutu.   Did that really happen?

A.   Well, yeah.   But it was on May, 12, 2009; Wednesday.

(App. E at 183–84).

Defense counsel followed up with one question (App. E at 184).   Counsel asked T.V. if anyone else ever touched her tutu other than Uncle Pauly (*id.*).   T.V. responded, "No; no; no; no; no.   Everyone is friendly except him.   He was . . . being a nasty, gross, and . . . awful man." (*id.*).

T.V.'s father, James Varner, testified he met Burns several years ago (App. E at 186).   Mr. Varner testified Burns was his best friend, and he trusted him (*id.* at 188).   Mr. Varner testified Burns and T.V. did several activities together, including playing on the swings, going out on the boat, and shopping at the grocery store (*id.* at 187–88).   Mr. Varner testified Burns was sometimes alone with T.V., for example, when he picked her up at her grandparents' house and brought her home (*id.* at 188).

Mr. Varner testified Burns worked at Amalfi Coast, which was a condominium complex in Walton County (App. E at 189).   Mr. Varner testified he had visited Burns at his office at Amalfi Coast (*id.*).   The prosecutor asked Mr. Varner if T.V. ever associated certain items with certain things; for example, did she associate a blackboard or chalkboard with a school (*id.*).   Mr. Varner answered, "Oh, yes." (*id.*).   Mr. Varner testified he had taken T.V. with him to Burns' office at Amalfi Coast, and he stated he had referred to Burns' workplace as a "school" (*id.*

at 190).   The prosecutor asked Mr. Varner why he referred to it as a school, and Varner responded, "Because that's what T.V. would say." (*id.*).   Mr. Varner testified there was a blackboard hanging on the wall of Burns' office, which was visible immediately upon entering (*id.*).   Mr. Varner testified Burns also worked at a neighborhood development called Hidden Grove, providing maintenance services for the building and swimming pool (*id.* at 191).   Mr. Varner testified Burns told him that he took T.V. there, and that he was going to buy her a swimsuit so they could play in the pool together (*id.*).

Stephen Sunday, an investigator with the Walton County Sheriff's Office, testified he was assigned to investigate Ms. Herrick's report (App. E at 200). Investigator Sunday testified he contacted the child protective services agency and then contacted T.V.'s parents (*id.* at 201).   Investigator Sunday testified he subsequently contacted Burns by phone and asked him to come to the sheriff's office (*id.* at 202).   Burns met Investigator Sunday at the sheriff's office on August 30, 2011 (*id.* at 201–02).   Investigator Sunday told Burns that Candace Herrick had filed a complaint concerning her daughter, T.V., and that she and Mr. Varner wanted Burns to know that he was no longer allowed to contact them (*id.* at 201–02). Investigator Sunday testified he never provided Burns with a general or specific

description of any allegations underlying the complaint (*id.* at 202, 205). Sunday testified he and Burns finished talking, and Burns spontaneously said, "T[.V.] would not lie; she couldn't tell a lie if she wanted to" (*id.* at 205).

The State re-called T.V.'s mother, Ms. Herrick (App. E at 209). She testified she listened to the recording of the second time she interviewed T.V. (the day after the Silly Putty incident) (*id.* at 211).

Defense counsel cross-examined Ms. Herrick about the recorded interview as follows:

> Q. [D]o you remember asking T[.V.] that you had a very important question: That—Did Uncle Pauly touch you right in the tutu area?
>
> A. I had a very hard time understanding even my own voice and questions that I asked her. We turned the volume up; we turned it lower; and I could not make out half of what I said.
>
> Q. Okay. Well, do you remember repeating variations of, Did he pull your britches down?
>
> A. I believe—
>
> Q. Multiple times?
>
> A. I believe I asked her—Yes.
>
> Q. Do you think it was over five times?
>
> A. I have no clue. Sorry.

Q.  Okay. And did she give you the same answer each time?

A.  Like I said, I didn't—I couldn't understand—I couldn't understand how many times I asked or—or what—like I said, what I was saying.  I know—

Q.  Well, let—let me ask you:   Did you ever hear any time that she said no, Paul Burns did not pull her britches down?

A.  I don't recall.

Q.  Okay.  And do you recall asking the child if Mr. Burns kissed her tutu like Larry did?

A.  I believe I did ask her that question.

Q.  Okay.  And how many times did you ask her that question?

A.  I have no idea.  I don't remember hearing that answer on the tape, but I remember asking her that question.

Q.  Okay.  And can you tell me who Larry is?

A.  Larry was a little grade school friend who came to visit when she was at Bay Elementary several years ago.

Q.  Okay.  And did anything occur while he visited?

A.  That's what she told me happened.

Q.  Did you see anything?  Did you see anything that might have transpired between T[.V.] and Larry?

A.  She and—my daughter, T[.V.], and Larry and Larry's younger sister were in T[.V.]'s bedroom playing and they were just

sitting up on the bed watching a movie while my husband and—and their parents were on the porch eating pizza.

Q.   Okay.   And did you—did you relate this information to Investigator Sunday?

A.   I don't recall.   I did give him the tape.

Q.   Okay.   But you do remember asking her if Mr. Burns kissed her tutu like Larry did.

A.   I—I remember—I think I remember asking her that question at one time.   I don't remember if it was on that tape or not.

Q.   Okay.   And why did you ask her if Mr. Burns did something like Larry did, especially when you're referring directly to kissing the tutu; your daughter's tutu?

A.   I guess so she would have a better understanding of maybe what I was talking about?   I'm not sure.

Q.   So you think that Larry did kiss T[.V.]'s tutu?

A.   Yes.

Q.   And what's your source that—that Larry kissed T[.V.]'s tutu?

A.   Because she told me he did.

Q.   Okay.   And so do you recall, in your prior testimony, if I asked you if—a question regarding if anyone else could possibly have kissed T[.V.]'s tutu?

A.   I don't remember exactly.   I referred to Mr. Burns and I said that she was not going to learn from anyone else.

Q.  Okay.  And in listening to the tape, did you notice that you repeated your questions numerous times?

A.  Yes.

Q.  And you'd repeat the same question numerous times?

A.  I just—I know that tape was lengthy.  She was—she was very upset.

Q.  Well, why would she feel upset?

A.  I assume she didn't want to talk about it anymore.

Q.  Okay.  And I thought that the beginning of the tape was somewhat clearer.  Did you—did T[.V.] deny that Mr. Burns hurt her at the beginning of the tape that you just listened to?
. . . .
A.  From what I remember hearing on the tape, I thought that she stated yes and that he stated he couldn't help himself.

Q.  Okay.  And on the tape, did you ask her if T[.V.] grabbed his tail?

A.  I didn't hear that part.

Q.  You didn't hear it?  Okay.  And do you remember continuing to tell T[.V.]—can you hear that you're praising her a lot throughout all of her answers?

A.  I did hear a good —I did say, You're—You're a good girl; you're being a good girl; just answer the truth; just tell Mother the truth.

Q.  And do you recall if her answers were different; would she answer the same question different?

A.  I don't recall.  Like I said, I had a very difficult time understanding that tape.

Q.  Okay.  Did you—did you hear anything regarding ice cream in the tape; going to get ice cream?

A.  Yes, I did.

Q.  Would that have been towards the end of the tape?

A.  It was towards the end of the tape.  And I don't know.  I tried to listen to that.   I don't know if she asked for ice cream and I said we could have ice cream later.   I don't—I don't know the reference.

Q.  You weren't rewarding her for changing—changing her answers to your questions, were you?

A.  No, sir.

Q.  Okay.  And did you mention going to Grandma and Grandpa's house?

A.  I have no idea.   But that's a daily thing that we say.

Q.  Okay.  And did you talk with T[.V.] about her testimony here today?

A.  No, sir.

Q.  You didn't prep her at all?

A.  No, sir.

Q.  Okay.  So if T[.V.] was in here testifying that you did talk to her about it, T[.V.] would be untruthful?

A.  T[.V.] would be untruthful?

Q.  Correct.

A.  That I—I'm sorry.  She was being—

Q.  If T[.V.]—if T[.V.] was in here today and testified—assuming she testified, that she did state that she talked with you regarding her testimony today—

A.  Then she would be untruthful.

(App. E at 211–17).

The next witness presented by the State was Jennifer Lopez, Burns' biological daughter, who was thirty-two years old at the time she testified (App. E at 218–19).[7] Ms. Lopez testified that the last time she saw her father (Burns) was when she was ten years old (*id.* at 219).  Ms. Lopez testified that at that time, she was visiting him for two weeks (*id.* at 219–21).  Ms. Lopez testified that while she and Burns were alone at his friend's apartment, Burns put his mouth on her vagina, had her put her mouth on his penis, and put his penis up to her vagina (*id.* at 220).  Ms. Lopez

---

[7]  Prior to Ms. Lopez's testimony, the trial court instructed the jury that her testimony regarding acts that Burns' allegedly committed could be considered only for the limited purpose of proving motive, opportunity, intent, preparation, plan, knowledge, identity, the absence of mistake or accident on Burns' part (App. E at 218).

testified that during the same two-week visit, Burns performed oral sex on her on two other occasions (*id.* at 221).

The State then presented testimony from Patricia Meeks, a case coordinator with the Child Protection Team (CPT) (App. E at 222–23).   Ms. Meeks testified she had been a case coordinator for over nine years and completed forensic interviews with children as part of her job duties (*id.* at 223).   Ms. Meeks described "forensic interviews" as structured interviews designed to be open-ended questioning for children (*id.*).   She testified regarding the training she initially received and continued to receive in conducting forensic interviews of children (*id.* at 223–24).

Ms. Meeks testified she conducted a forensic interview with T.V. at the CAC on September 23, 2011 (one month after the mother's questioning) (App. E at 224–25).   Ms. Meeks testified she was aware, prior to the interview, that T.V. was autistic (*id.* at 228).   When asked whether she accounted for T.V.'s condition in her questioning, Ms. Meeks answered, "Yes . . . . but I interviewed T[.V.] like I would—through the forensic interview structure that I have been trained in, like I would any other child." (*id.*).   Ms. Meeks explained:

> Well, a—a forensic interview is designed—it's a structured interview that we're trained to follow on that structure.   So this structure was the same, meaning we start with rapport building, which I did.   We talked about some fun things she likes to do.   Then we go

into the guidelines of the interview, which we talked about the rules and tell the truth.  Then we go into talking about, you know, why—why she's here today.   And so that's the structure I'm talking about.   And we followed that structure.

Q.  So it's a one-size-fits-all structure?

A.  Well, each child is individual and we have—we adjust to, you know, how we're going to speak and talk with that child, yes.   But that is the main structure we use because we want it to be an open-ended, non-leading interview.

Q.  Okay.  Do you put more safeguards in there if you are interviewing an autistic child?

A.  I don't know what you mean by safeguards.

Q.  I guess make more safeguards as far as making sure that you're not conducting a leading interview.

A.  No.

(App. E at 246–47).

Ms. Meeks testified that her interview with T.V. was video recorded, and the video recording was published to the jury (App. E at 229–45).   During the interview, T.V. stated that Uncle Pauly was "mean" (*id.* at 234).   Ms. Meeks asked T.V. what she meant by "mean," and T.V. responded that he touched her tutu (*id.*).   T.V. told Ms. Meeks that Uncle Pauly touched her tutu under her clothes (*id.* at 234–35).   Ms. Meeks asked what Uncle Pauly touched her with, and T.V. responded his

tongue and nothing else (*id.* at 235, 239).   T.V. told Ms. Meeks they were in Uncle

Pauly's garage when this happened (*id.* at 235–37).   T.V. stated Uncle Pauly put his

tongue on her tutu more than once (*id.* at 236).   T.V. stated that no one else had ever

touched her tutu, just Uncle Pauly (*id.* at 239).   Ms. Meeks asked T.V. if Uncle

Pauly said anything about telling or not telling anybody (*id.*).   T.V. responded, "He

said I'm sorry; I won't do it again." (*id.*).

On cross-examination, Ms. Meeks testified that she interviewed T.V. after Ms.

Herrick questioned her and recorded the questioning (App. E at 246).

After the State presented its case in chief, Burns' defense counsel moved for

a JOA (App. E at 249–50).   The trial court denied the motion (*id.* at 250).

In Burns' defense, counsel presented the recording of the mother's second

interview of T.V. (App. E at 256–59).[8]   Defense counsel then called T.V. as a

witness (App. E at 261–62).   Counsel first asked T.V. if she knew anyone named

Larry (*id*. at 261).   T.V. responded:   "I don't know him.   But it's against the law

if you know him.   But—but—but it's 5,359 million of—of years." (*id*.).   Defense

---

[8]  As discussed *supra* in Ground One, the court had previously ruled that the recording was not
admissible as substantive evidence, but it was admissible for purposes of "rebutting" Ms. Herrick's
inconsistent statements during her testimony (App. E at 113–16).   But when defense counsel
announced he wished to play the recording for the jury, the State did not object, and the recording
was published in its entirety without any limiting instruction to the jury regarding its use (*id.* at
255–59).

counsel then asked T.V. if she ever told her mother that a child named Larry kissed her tutu (*id.*).   T.V. first responded as follows: "Yeah.   But he wore some glasses like Christine Carol (unintelligible).   But that was a mean lady." (*id.* at 262).   Counsel again asked T.V. whether Larry "had ever kiss[ed] her tutu," and T.V. responded "Yes; yes; yes." (*id.*).   The defense then rested.

Defense counsel renewed his motion for JOA, arguing that T.V.'s lack of competency and the inconsistency of the testimony was insufficient to send the case to the jury (App. E at 263).   The trial court took the motion under advisement and subsequently denied it (*id.* at 264, 301).

The trial court instructed the jury that to prove the crime of sexual battery, the State must prove that Burns committed an act upon T.V. in which her sexual organ was penetrated by or had union with Burns' *mouth* (App. A at 75–76 (written jury instruction); App. E at 285 (verbal instruction)).

After Burns' conviction and sentencing, defense counsel filed a motion for new trial under Rule 3.600 of the Florida Rules of Criminal Procedure (App. A at 135–36).   As two of the four grounds for his motion, counsel argued the trial court erred by determining that T.V. was competent to testify, and the verdict was contrary to the law and weight of the evidence (*id.*).   The trial court held a hearing on the

motion and, according to the clerk of court's minute sheet, denied the motion for new trial (*see id.* at 139).

### 1.    Appellate Counsel's Failure to Challenge Trial Court's Ruling on T.V.'s Competency to Testify

With respect to appellate counsel's failure to argue error regarding the trial court's competency ruling, the test applied in the Florida courts in determining the competency of a child witness is based on "his or her intelligence, rather than his or her age, and, in addition, whether the child possesses a sense of obligation to tell the truth."   *Floyd v. State*, 18 So. 3d 432, 443–44 (Fla. 2009) (internal quotation marks and citations omitted).   When evaluating the competency of a child, the trial court should consider the following:

> (1) whether the child is capable of observing and recollecting facts; (2) whether the child is capable of narrating those facts to the court or to a jury; and (3) whether the child has a moral sense of the obligation to tell the truth.

*Floyd*, 18 So. 3d at 443 (citations omitted).

The trial judge has the discretion to decide whether a witness of tender age is competent to testify and, accordingly, the court's decision is reviewed for abuse of discretion.   *Floyd*, 18 So. 3d at 444.   A trial court's denial of a motion for new trial is also reviewed under the abuse of discretion standard.   *See Woods v. State*, 733

So. 2d 980, 988 (Fla. 1999). Under the "abuse of discretion" standard of review, a ruling will be upheld unless the ruling is "arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only where no reasonable person would take the view adopted by the trial court." *Banks v. State*, 46 So. 3d 989, 997 (Fla. 2010) (internal quotation marks and citations omitted).

Considering T.V.'s testimony during voir dire and her testimony in front of the jury, no fairminded jurist could agree with the First DCA's rejection of Burns' IAAC claim. Every fairminded jurist must conclude that appellate counsel performed deficiently by failing to challenge the trial court's competency ruling. Additionally, every fairminded jurist must conclude that there is a reasonable probability the appellate court would have determined that the trial court's competency ruling was an abuse of discretion (in other words, there is a reasonable probability the appellate court would have concluded that no reasonable person could conclude that T.V. had a moral sense of the obligation to tell the truth, **was capable of** observing and **recollecting facts**, **and was capable of narrating those facts to the jury**). Burns has demonstrated that AEDPA deference does not apply to the First DCA's rejection of his IAAC claim based upon counsel's failure to challenge the trial court's competency ruling.

When a federal habeas petitioner satisfies section 2254(d), the federal court must consider and resolve the federal claim on the merits without deferring to the state court's resolution of the claim.    *See Panetti*, 551 U.S. at 953–44.    With respect to *Strickland*'s performance prong, "[w]here, as here, appellate counsel fails to raise a claim on appeal that is so obviously valid that any competent lawyer would have raised it, no further evidence is needed to determine whether counsel was ineffective for not having done so."    *Eagle*, 279 F.3d at 943.    "[N]o conceivable reason that [appellate counsel] might have proffered would have made her failure to pursue the claim reasonable.    [Counsel's] failure to raise it, standing alone, establishes her ineffectiveness."    *Eagle*, 279 F.3d at 943; *see also Overstreet v. Warden*, 811 F.3d 1283, 1287–88 (11th Cir. 2016) (a defendant's "appellate representation was undeniably ineffective" because "had [ ] appellate counsel raised" a state-law claim based on a Georgia Supreme Court case decided shortly before the defendant's direct appeal, then "absent a departure from precedent, [his] kidnapping convictions would have been reversed.").

As previously discussed, the core factors to consider when evaluating the competency of a child are:   (1) whether the child is capable of observing and recollecting facts; (2) whether the child is capable of narrating those facts to the court

or to a jury; and (3) whether the child has a moral sense of the obligation to tell the truth.   *Floyd*, 18 So. 3d at 443 (citations omitted); *Griffin v. State*, 526 So. 2d 752, 753 (Fla. 1st  DCA 1998).   The court must also consider the entire context of the child's testimony and whether it is corroborated by other evidence.   *Bennett v. State*, 971 So. 2d 196, 201 (Fla. 1st DCA 2007) (citing *Lloyd v. State*, 524 So. 2d 396, 400 (Fla. 1988)).   The trial court's questioning of the child victim concerning the three core competency factors must be more than cursory.   *Black v. State*, 864 So. 2d 464 (Fla. 1st DCA 2003) (trial court's cursory questions did not demonstrate that the child could recollect facts, narrate those facts, or that she had the "moral sense of the obligation to tell the truth").

Here, a challenge to the trial court's competency determination was so obviously valid from the face of the trial transcript that any competent appellate lawyer would have raised it.   T.V.'s trial testimony shows that she was wholly unable to narrate facts to the jury and also appeared unable to recollect facts. Considering the trial record and the Florida state law discussed *supra*, Burns has demonstrated that his appellate counsel was objectively unreasonable in failing to challenge the trial court's competency ruling on direct appeal.

With respect to *Strickland*'s prejudice prong, the record also shows that "the omitted claim would have had a reasonable probability of success" on appeal. *Eagle*, 279 F.3d at 943.   This makes counsel's performance "necessarily prejudicial because it affected the outcome of the appeal."   *Id.*   If Burns' appellate counsel had challenged the trial court's competency determination, the state appellate court would, in all probability, have opted to grant a new trial.   There can be no doubt, then, that counsel's decision to omit the competency claim from her brief "undermines confidence in the outcome of [Burns'] direct appeal sufficient to satisfy the prejudice prong of *Strickland*."   *Id.*

Generally speaking, even when the federal court conducts a de novo review of the merits of a petitioner's claim, the petitioner must also show that he is in custody "in violation of the Constitution or laws and treaties of the United States," *see* 28 U.S.C. § 2254(a), and that the constitutional error resulted in "actual prejudice," meaning, the error "had a substantial and injurious effect or influence in determining the jury's verdict."   *See Brecht*, 507 U.S. at 637 (internal quotation marks and citation omitted).   However, some constitutional claims already encompass a prejudice component that subsumes the harmless error test.   For example, for ineffective assistance of counsel claims brought under *Strickland*, a

prejudice component is included in the constitutional test that is more onerous (from a petitioner's perspective) than the harmless error test generally applied to constitutional claims. Thus, if the petitioner establishes a violation of his Sixth Amendment rights under *Strickland*, he will have necessarily demonstrated that the Sixth Amendment violation was not harmless. *See* Means, *Postconviction Remedies*, § 30:2 (West 2014 ed.) (footnotes omitted).

Burns has established a Sixth Amendment violation with respect to appellate counsel's failure to challenge the trial court's ruling on T.V.'s competency to testify at Burns' trial. Therefore, Burns is entitled to federal habeas relief on this IAAC claim. The appropriate remedy is to issue a writ of habeas corpus conditioned on the State's providing Burns an opportunity to present this issue to the state appellate court within a reasonable time. *See Davis v. Sec'y for Dep't of Corr.*, 341 F.3d 1310, 1317 (11th Cir. 2003) (where there was a reasonable probability state appellate court would have reversed petitioner's conviction but for counsel's failure to preserve *Batson* challenge, federal court should grant writ of habeas corpus conditioned on the State's provision of ether a new trial or an opportunity to take an out-of-time appeal wherein his *Batson* challenge could be decided by the state courts on its merits) (comparing *Eagle*, 279 F.3d at 944 (remanding "with instructions to

issue a writ of habeas corpus conditioned on the State's right to provide Eagle a new trial within a reasonable period of time"), with *Pressley v. Wainwright*, 540 F.2d 818, 819 n.2 (5th Cir. 1976) (ordering the State "either to allow a belated application for certiorari or to set aside the conviction and grant a new trial within a reasonable time," in a case granting habeas relief on the basis of counsel's ineffectiveness in protecting a client's right to seek review in the Florida Supreme Court)); *see also, e.g.*, *Hall v. Warden, Lee Arrendale State Prison*, 686 F. App'x 671, 685 (11th Cir. 2017) (unpublished but cited as persuasive authority) (holding that petitioner's appellate counsel was ineffective and remanding case to district court to order the State to grant petitioner a new direct appeal).

> ### 2.    Appellate Counsel's Failure to Challenge Trial Court's Ruling on Sufficiency of Evidence to Support Conviction

Burns is also entitled to federal habeas relief on his claim that appellate counsel was ineffective for failing to argue that the trial court erred by denying defense counsel's motions for JOA and a new trial.  With respect to appellate counsel's failure to challenge the trial court's denial of the defense's motion for JOA, in Florida, a trial court's denial of a motion for JOA is reviewed on appeal under a de novo standard.  *See Hobart v. State*, 175 So. 3d 191, 199 (Fla. 2015).  Under

both Florida and federal law, the reviewing court must consider the evidence and all reasonable inferences from the evidence in a light most favorable to the State.    *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Lynch v. State*, 293 So. 2d 44, 45 (Fla. 1974).    In moving for a judgment of acquittal, a defendant admits not only the facts stated in the evidence adduced, but also admits every conclusion favorable to the State that a jury might fairly and reasonably infer from the evidence.    *See Jackson* 443 U.S. at 319; *Lynch*, 293 So. 2d at 45.    The reviewing court may not reweigh the evidence or assess the credibility of witnesses.    *See Tibbs v. State*, 397 So. 2d 1120 (Fla. 1981).    The legal test for determining whether a JOA should be granted is "whether after all conflicts in the evidence and all reasonable inferences therefrom have been resolved in favor of the verdict on appeal, there is substantial, competent evidence to support the verdict and judgment."    *Id.* at 1123.

The entry of a judgment of acquittal is appropriate only in those rare instances where **no** evidence exists to support entry of a conviction.    *See C.J.P. v. State*, 672 So. 2d 62 (Fla. 1st DCA 1996) (citation omitted) (emphasis added).    If there is room for a difference of opinion between reasonable persons with respect to the proof of facts from which an ultimate fact is sought to be established, or if there is room for such differences with respect to an inference which might be drawn from conceded

facts, the court should submit the case to the finder of fact; the conclusion of the jury or fact-finder regarding a fact or inference in such cases should prevail. *See Lynch v. State*, 293 So. 2d 44, 45 (Fla. 1974).

But where the evidence creates "only a strong suspicion of guilt or simply a probability of guilt, the evidence is insufficient to sustain a conviction." *Cox v. State*, 555 So .2d 352, 353 (Fla.1989). Additionally, evidence is insufficient to support a conviction when it requires pyramiding of assumptions or impermissibly stacked inferences. *See Baugh v. State*, 961 So. 2d 198, 205 (Fla. 2007) (citations omitted).

With respect to a post-verdict motion for new trial, Rule 3.600 of the Florida Rules of Criminal Procedure provides that the court must grant a new trial if the verdict was contrary to law or the weight of the evidence. Fla. R. Crim. P. 3.600(a)(2). When considering a motion for new trial under rule 3.600(a)(2), the trial court must exercise its discretion to determine "whether a greater amount of credible evidence supports an acquittal." *Ferebee v. State*, 967 So. 2d 1071, 1073 (Fla. 2d DCA 2007) (internal quotation marks and citation omitted). "Rule 3.600(a)(2) thus enables the trial judge to weigh the evidence and determine the

credibility of witnesses so as to act, in effect, as an additional juror."    *Tibbs v. State*, 397 So. 2d 1120, 1123 n.9 (Fla. 1981).

At the time Burns' direct appeal was pending,[9] the Florida Supreme Court had issued three decisions holding that if a child victim of sexual abuse totally repudiates his or her out-of-court statements at trial, and the prosecution adduces no eyewitness or physical evidence of abuse, the trial court must grant a JOA when the other evidence presented by the prosecution does not corroborate the facts alleged in the victim's repudiated statement.    *See Baugh*, 961 So. 2d at 200; *Beber v. State*, 1248, 1253 (Fla. 2004); *State v. Green*, 667 So. 2d 756 (Fla. 1995).

In *Green*, the Florida Supreme Court was asked whether a child victim's prior inconsistent hearsay statements, which were admitted as substantive evidence pursuant to section 90.803(23), were sufficient to sustain a criminal conviction.    667 So. 2d at 760.    The court explained that "[t]o allow the state to use as its sole evidence of the commission of the crime charged such prior unsworn, out of court statements which were not subject to cross-examination by the defendant [would] violate[ ] the [defendant's] sixth amendment right to confrontation and cross-examination."    *Id.* (internal quotation marks and citation omitted).    The court held

---

[9]  The First DCA granted Burns a belated direct appeal on December 26, 2013, and issued its opinion affirming his conviction on June 30, 2015.

that although inconsistent statements admitted under § 90.803(23) can be used as substantive evidence *when other proper corroborating evidence is admitted*, in Green's case, the testimony of an examining physician was "simply not adequate to supply that corroboration." *Id.* at 761.

In *Beber*, the Florida Supreme Court again considered whether a child victim's hearsay statements, alone, were sufficient to sustain the defendant's conviction. 887 So. 2d at 1249. The six-year-old child victim told his parents that Beber had "touched his private." *Id.* During a videotaped interview with a child protection team nurse, the child stated that Beber put the child's penis in Beber's mouth on two different occasions. *Id.* at 1250. Beber was charged with two counts of capital sexual battery by "placing his mouth, tongue on or in union with the [child's] penis." *Id.* at 1251–52.[10]

On direct examination at trial, the child was unresponsive, often answering the prosecutor's questions with "I don't know," or that he did not remember. *Beber*, 887 So. 2d at 1252. When asked by the prosecutor what Beber touched the victim's "private" with, the child answered, "his hand." *Id.* The prosecutor asked the child:

---

[10] Burns was similarly charged in a one-count information with sexual battery on a child, specifically by "placing his tongue on [T.V.'s] vagina . . ." (App. A at 16), and as indicated *supra*, the trial court instructed the jury that in order to find Burns guilty of sexual battery, the State had to prove that T.V.'s sexual organ had union with Burns' mouth.

"Did he ever touch your private with anything besides his hand?" *Id.* The child replied: "I don't know." *Id.* On cross-examination, defense counsel followed up on this line of questioning. When defense counsel asked what Beber had touched the child with, the child stated that he was sure that Beber never touched him with anything but his hands. *Id.* The child also swore that this was true. *Id.*

The Florida Supreme Court held that the child victim's hearsay statements, alone, were insufficient to sustain Beber's conviction. *Beber*, 887 So. 2d at 1253.

In *Baugh*, the seven-year-old child victim, C.P., told a police detective Baugh made her perform fellatio on him, that she had performed the same act on Baugh twelve times previously, and that "white stuff came out, which tasted bad." 961 So. 2d at 201. C.P. also told investigators that Baugh had shown her pictures to teach her how to perform oral sex. *Id.* Ten days later, C.P. repeated this story to the state attorney and the detective. *Id.* Four days after that, C.P. repeated the same story to a child protection team nurse. *Id.* However, according to C.P.'s mother, C.P. voluntarily recanted her story a month later, and told her mother that she had lied about what happened with Baugh. *Id.*

At Baugh's trial, C.P. testified that her original story was a "fib" which she made up to get Baugh in a "'little, but not that much trouble,' because sometimes he

made her mad." *Baugh*, 961 So. 2d at 201.   C.P. also stated that she learned the details of the sexual act from her older brother, who had been assaulted by a different individual in a manner identical to what she had described to the detective.   *Id.* C.P. explained that she maintained her story about Baugh because she was afraid of what her mother might do if she found out that C.P. had lied.   *Id.*   C.P. stated that she ultimately decided to tell the truth because she was sad that her family had been broken apart.   *Id.*   C.P. also stated that Baugh had never shown her the pornographic pictures that police had recovered from their house; and that she had found the pictures while snooping in her mother's bedroom.   *Id.*   C.P. also testified about new house rules instituted by her mother after the incident, including a rule regarding proper clothing in the house and a prohibition on locking the interior doors of the house.   *Id.*

The Florida Supreme court held that C.P.'s out-of-court statements directly conflicted with her in-court testimony, and thus were not sufficient, by themselves, to sustain Baugh's conviction.   *Baugh*, 961 So. 2d at 203.   The court then considered whether the evidence presented at trial to corroborate C.P.'s out-of-court statements was sufficient to sustain Baugh's conviction.   *Id.*

The other evidence presented by the State included testimony from the detective, the CPT nurse, and C.P.'s mother, all of whom repeated C.P.'s prior statements about the incident. *Baugh*, 961 So. 2d at 201. The State also presented the mother's description of Baugh's statements and actions after she confronted him with C.P.'s allegation that he made her perform fellatio. *Baugh*, 961 So. 2d at 200. According to C.P.'s mother, Baugh denied doing what C.P. claimed, and as the argument between him and the mother progressed, Baugh stated that he wanted C.P. to perform fellatio on him, have the mother watch, and then have sex with the mother. *Id.* After the mother called the police, Baugh went into the bathroom and attempted to slash his wrists and arms. *Id.* at 200–01. Thereafter, the State introduced testimony from two additional witnesses, an inmate imprisoned with Baugh and one of the mother's former friends, in order to rebut the testimony of C.P. and her mother concerning C.P.'s decision to change her story. *Baugh*, 961 So. 2d at 201. The inmate claimed that he overheard Baugh telling female visitors that "they had to get the little girl to 'recamp' [sic] her story because otherwise he was looking at life in prison." *Id.* The mother's former friend testified that C.P. told her "'it really did happen' but [the mother] wanted her to change her story." *Id.*

The Florida Supreme Court noted that the only direct evidence (i.e., "evidence to which the witness testifies of his [or her] own knowledge as to the facts at issue," *see Baugh*, 961 So. 2d at 203 n.5 (internal quotation marks and citation omitted)) presented by the State was C.P.'s out-of-court hearsay statements, which C.P. completely recanted during her in-court testimony. *Baugh*, 961 So. 2d at 203. The evidence which was offered as "corroborating" these out-of-court statements, was circumstantial evidence (i.e., "proof of certain facts and circumstances from which the trier of fact may infer that the ultimate facts in dispute existed or did not exist, *see Baugh*, 961 So. 2d at 203 n.5 (internal quotation marks and citation omitted)) from which the jury had to infer that Baugh had perpetrated a sexual battery on the child. *Baugh*, 961 So. 2d at 203.

The Florida Supreme Court held that none of the circumstantial evidence, either individually or collectively, actually corroborated C.P.'s recanted out-of-court statements concerning fellatio. *Baugh*, 961 So. 2d at 204. The court held that even if Baugh's purported "admission" was viewed as a statement of desire rather than a rash response during a heated argument, it still only showed that he had thoughts about committing sexual battery on the child, not that he actually committed the act. *Id.* Further, the fact that Baugh slashed his wrists after being confronted by C.P.'s

mother may have been "suggestive of guilt," but it was also consistent with a troubled defendant in need of psychotherapy, as evidenced by Baugh's earlier suicide attempt by the same method when his telephone service was turned off for nonpayment. *Id.* Additionally, while the testimony of both the jail inmate and the mother's former friend about C.P.'s recantation could indicate that C.P. was pressured to change her story, it also reflected the reality of the situation—Baugh would not get out of jail as long as the child alleged that he committed the crime. *Id.* at 204–05. The Florida Supreme Court concluded that the evidence presented to "corroborate" C.P.'s recanted out-of-court statements did not necessarily strengthen or confirm the recanted out-of-court statements; therefore, it was insufficient to sustain Baugh's conviction. *Id.* at 205.

Also at the time of Burns' direct appeal, the Florida First DCA had decided *Johnson v. State*, 1 So. 3d 1164 (Fla. 1st DCA 2009), which applied *Beber* and was particularly persuasive on the issue of whether the evidence was sufficient to support Burns' conviction. In *Johnson*, the defendant's six-year-old son, M.J., and ten-year-old daughter, L.J., stated during videotaped interviews with the child protection team that Johnson had sexually molested them. 1 So. 3d at 1164–65. At trial, the State presented the testimony of several adults, who related the statements the

children had made to them.  *Id.* at 1165.  The State also introduced the videotaped interviews with the child protection team member.  *Id.*

However, M.J. and L.J. did not testify consistently with the statements they had made earlier, and their testimony was not otherwise sufficient to prove that the crimes had been committed.  *Johnson*, 1 So. 3d at 1165.  When M.J. was called as a witness at trial, he testified that the things he said on the videotape had not happened.  *Id.*  The prosecutor asked why he would have told the child protection team worker that his father had molested him, and he replied, "I don't know."  *Id.* When pressed further on the issue, he said that his sister, P.J., had convinced him to make the accusation against his father.  *Id.*  M.J. said several times that he was not sure whether the testimony he was giving in court was true.  *Id.*  However, at no point did he repeat or adopt the accusation he had made earlier against his father. *Id.*

Likewise, L.J. testified at trial that the accusations she had made about her father were not true.  *Johnson*, 1 So. 3d at 1165.  She explained that she had joined her brother, sister, and cousin in making up the story about him.  *Id.*  When asked why she would do such a thing, she said that her father was mean.  *Id.*  The prosecutor questioned L.J. in detail about the accusations she had made to adults and

about the videotaped statement she had given to the child protection team member, but she did not confirm the truth of any of the statements.    *Id.*

When the state rested its case, Johnson moved for JOA on the charges involving M.J. and L.J.    *Johnson*, 1 So. 3d at 1165.   He argued these charges were supported only by hearsay statements that were recanted by the children in their trial testimony.    *Id.*   The trial court granted the motion as to the charge pertaining to L.J. *Id.*   But the court denied the motion for JOA as to the charges pertaining to M.J., reasoning that M.J. had testified at trial that he did not know if he was telling the truth, so his testimony was not actually a recantation of the statements that had been related to the jury under section 90.803(23).    *Id.*

The First DCA opined:

> The most that could be said of M.J.'s trial testimony is that it leaves open the possibility that his earlier accusation was true.   That is not proof of guilt.   The child was reluctant and equivocal, but at no point did he adopt or support the accusation he had made in his out-of-court statement.   The state has the burden of proving beyond a reasonable doubt that the defendant is guilty of the crime charged. That burden cannot be established by testimony that the victim does not know whether he is telling the truth by retracting an earlier accusation. It can only be established by affirmative evidence that the crime was committed.

*Johnson*, 1 So. 3d at 1166.   The court held that because there was no evidence of the crimes against M.J. other than the child's out-of-court statements, Johnson's convictions must be reversed.   *Id.*

Here, as in *Johnson*, the most that could be said of T.V.'s trial testimony is that it left open the possibility that her earlier, out-of-court accusation—that Burns' tongue (or mouth) had union with her "tutu"—was true.   Further, only the similar fact testimony of Ms. Lopez arguably corroborated the specific act of oral union. The weight of this so-called corroborating evidence paled in comparison to that which the Florida Supreme Court held was insufficient in *Baugh*.   Although the *Baugh* victim "totally repudiated" her out-of-court statement, the principle of law apparently applies even to a partially repudiated out-of-court statement, as illustrated in *Beber*, where the victim repudiated his pre-trial statement that the defendant had performed fellatio on him but continued to maintain that the defendant touched his penis.

Considering the trial evidence described *supra* and all reasonable inferences from this evidence in the light most favorable to the State, and applying the Florida courts' decisions to that evidence, no fairminded jurist could agree with the First DCA's rejection of Burns' IAAC claim.   Indeed, every fairminded jurist must

conclude that Burns' appellate counsel was deficient for failing to argue that there was insufficient evidence to support the conviction. [11]    Additionally, every fairminded jurist must conclude that Burns had a reasonable probability of success on appeal if counsel had argued that there was insufficient evidence to support the conviction.    Burns has demonstrated that AEDPA deference does not apply to the First DCA's adjudication of this IAAC claim.

Considering Burn's IAAC claim without deferring to the First DCA's opinion on it, the undersigned concludes that Burns has demonstrated that his appellate counsel was objectively unreasonable in failing argue that the evidence was insufficient to sustain the conviction.    Additionally, if Burns' appellate counsel had challenged the sufficiency of the evidence, there is a reasonable probability the issue would have been successful on direct appeal.

Burns demonstrated a Sixth Amendment violation with respect to his IAAC claim based on appellate counsel's failure to challenge the sufficiency of the evidence on direct appeal.    Therefore, Burns is entitled to issuance of the writ

---

[11] Even if the challenge to the sufficiency of the evidence was deemed unpreserved, Burns' appellate counsel could have successfully argued that the issue should be reviewed as fundamental error.    *See Mendez v. State*, 271 So. 3d 1093, 1099 (Fla. 3d DCA 2019) ("Because the evidence at trial was legally insufficient to support Mendez's lewd and lascivious molestation conviction, we hold that fundamental error has occurred, and we vacate said conviction.").

conditioned on the State's providing Burns an opportunity to present a challenge to the sufficiency of the evidence to the state appellate court.   *See Davis*, 341 F.3d at 1317.

### 2.    Federal Due Process Claims

In Grounds Three and Seven, Burns appears to assert a federal due process challenge to the sufficiency of the evidence, specifically, the trial court's denial of defense counsel's motion for judgment of acquittal (JOA) and motion for new trial. In Ground Seven, Burns appears to assert an additional federal due process challenge to the trial court's determination that T.V. was competent to testify.   The court will address each of these challenges in turn.

### a.    Federal Challenge to Trial Court's Ruling on Sufficiency of Evidence to Support Conviction

In Ground Three, Burns assert a federal challenge to the trial court's ruling on the sufficiency of the evidence, independent of Burns' IAAC claim based upon appellate counsel's failure to challenge the trial court's denial of the defense's motion for JOA and motion for new trial.   Burns presented this claim as Ground Three of his Rule 3.850 motion (App. E at 28–32).   The state court denied Burns' Rule 3.850 motion as untimely, and also noted that Burns' claims of trial court error were not properly presented in a rule 3.850 motion (*id.* at 88–91).

The state court's denial of Burns' Rule 3.850 motion as untimely rested on adequate state grounds, as did its determination that Burns' claims of trial court error were not properly presented in a Rule 3.850 motion.   Under Florida law, a Rule 3.850 motion must generally be filed within two years from when the judgment and sentence became final.   *See* Fla. R. Crim. P. 3.850(b).   Additionally, Rule 3.850 does not authorize relief based on grounds that could have or should have been raised on direct appeal.   *See* Fla. R. Crim. P. 3.850(c).

In Burns' case, the state court determined that the two-year limitations period under Rule 3.850(b) began to run on September 1, 2015, when Burns' judgment and sentence became final upon the First DCA's issuance of its mandate in Burns' direct appeal (*see* App. C at 88–89).   The court implicitly determined that the trial court's correction of Burns' sentence (by removing the mandatory minimum term) in December of 2016 did not affect the finality date of the judgment and sentence. This determination was in accordance with firmly established and regularly followed state procedural principles.[12]   The state court determined that Burns' Rule 3.850

---

[12]   Because the trial court corrected Burns' sentence **after** the conclusion of direct appeal proceedings, the resentencing did not affect the finality date of the judgment and sentence.   *See Zeigler v. State*, 632 So. 2d 48, 50 (Fla. 1993) (although defendant's death penalty was vacated in 1988, the two-year period for bringing claims attacking the judgment under Rule 3.850 expired on January 1, 1987, because the information upon which the claims were based was ascertainable prior to the finality date of the judgment and sentence); *Gillis v. State*, 32 So. 3d 681, 682 (Fla. 2d

motion was not filed by September 1, 2017 (according to the "mailbox rule," Burns

filed it on October 4, 2018 (*see* App. HH at 49)); therefore, the Rule 3.850 motion

was untimely (*see id.* at 89).

Additionally, Burns' claims of trial court error could have been raised on

direct appeal.   Therefore, as the state court determined, Rule 3.850 did not authorize

relief on such claims.   *See* Fla. R. Crim. P. 3.850(c).   Burns thus procedurally

defaulted his challenge to the trial court's denial of trial counsel's motion for JOA

and motion for new trial.

---

DCA 2010) (Mem) (defendant's resentencing, which occurred after direct review proceedings
concluded, did not toll two-year time limit for filing Rule 3.850 motion); *O'Neill v. State*, 6 So. 3d
630, 630 (Fla. 2d DCA 2009) (same); *Marrero v. State*, 967 So. 2d 934, 936 (Fla. 2d DCA 2007)
(same); *Smith v. State*, 886 So. 2d 336, 338 (Fla. 5th DCA 2004) (defendant's resentencing after
direct appeal concluded did not affect the finality of his judgment; therefore, Rule 3.850 motion
presenting double jeopardy challenge to the judgment, filed more than two years from the date of
the judgment, was time-barred); *Kissel v. State*, 757 So. 2d 631 (Fla. 5th DCA 2000) (although
defendant was resentenced pursuant to a 3.800(a) motion, the two-year limitation period for issues
raised in a 3.850 motion attacking the judgment commenced when the judgment became final, not
when defendant was resentenced).

Additionally, because the trial court corrected Burns' sentence after the conclusion of direct
appeal proceedings, his case is distinguishable from cases where the courts determined that
resentencing affected the finality date under Rule 3.850(b), because it occurred prior to conclusion
of direct appeal proceedings.  *See, e.g., Gland v. State*, 239 So. 3d 770, 772–73 (Fla. 2d DCA
2018); *Denizard v. State*, 157 So. 3d 386, 388 (Fla. 2d DCA 2015); *Breland v. State*, 58 So. 3d
326, 327 (Fla. 1st DCA 2011); *Ross v. State*, 947 So. 2d 699, 701 (Fla. 4th DCA 2007); *Pierce v.
State*, 875 So. 2d 726, 729 (Fla. 4th DCA 2004); *Skeens v. State*, 853 So. 2d 494, 495 (Fla. 2d
DCA 2003); *Snipes v. State*, 843 So. 2d 1043, 1044 (Fla. 2d DCA 2003).

Burns clearly argues that any procedural default was caused by ineffective assistance of appellate counsel.  A showing of ineffective assistance of appellate counsel in failing to raise a claim on direct appeal can constitute "cause" so long as the ineffective assistance "occurred during a stage when a petitioner had a constitutional right to counsel, and the ineffective-assistance claim itself is both exhausted and not procedurally defaulted."  *Sealey v. Warden, Ga. Diagnostic Prison*, 954 F.3d 1338, 1365 (11th Cir. 2020) (internal quotation marks and citations omitted).  No one disputes that Burns had a right to counsel during his state-court trial and direct appeal.  And as evident from the previous discussion of Burns' relevant IAAC claims, the State does not dispute that Burns properly exhausted his IAAC claims.  For the reasons discussed *supra*, Burns has demonstrated that his appellate counsel was ineffective for failing to challenge the sufficiency of the evidence on direct appeal.[13]  Because Burns has demonstrated he is entitled to federal review of his federal due process claim through the "cause and prejudice"

---

[13] The Eleventh Circuit has not decided whether a state court's decision concerning an ineffective assistance of counsel claim receives deference under § 2254(d) within a procedural default analysis.  *See Sealey v. Warden, Ga. Diagnostic Prison*, 954 F.3d 1338, 1365 n.16 (11th Cir. 2020) (citations omitted) (noting that this is an issue "that has divided courts" and declining to address the issue because petitioner's IAAC claim failed even under de novo review).  That does not matter here, because the undersigned determined that the First DCA's adjudication of Burns' relevant IAAC claims was **not** entitled to deference, and the undersigned further determined that Burns' IAAC claims were meritorious on de novo review.  Burns has satisfied the "cause and prejudice" standard.

gateway, the court must review his federal challenge to the sufficiency of the evidence de novo.

As an issue of federal law, Burns' challenge to the sufficiency of the evidence derives from the Fourteenth Amendment due process requirement that the evidence presented at trial be sufficient to convict, that is, the State must prove beyond a reasonable doubt every fact that constitutes an essential element of the crime charged against the defendant.  *In re Winship*, 397 U.S. 358, 364 (1970); *see also Beber*, 887 So. 2d at 1251.  When reviewing a claim of insufficient evidence in federal habeas corpus, the proper inquiry is not whether the reviewing court itself believes that the evidence established guilt beyond a reasonable doubt but "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citation omitted); *see also Conklin v. Schofield*, 366 F.3d 1191, 1200 (11th Cir. 2004); *Banks v. State*, 732 So. 2d 1065 (Fla. 1999).   Where the State presents no evidence whatsoever to prove one of the basic elements of the crime, the conviction fails to satisfy the Constitution's demands.  *Fiore v. White*, 531 U.S. 225, 229 (2001).

Under *Jackson*, federal courts must look to state law for the substantive elements of the offense.   443 U.S. at 324 n.16.   But the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law.   *Coleman v. Johnson*, 566 U.S. 650, 655 (2012).

Burns was convicted of sexual battery (victim less than twelve years of age) under Florida Statutes § 794.011(2)(a).   The charging document alleged the following:

> PAUL BURNS, between February 1, 2011 and August 24, 2011, at and in Walton County, Florida, being then eighteen (18) years of age or older, to-wit: 56 years of age did unlawfully commit a sexual battery upon a person less than twelve (12) years of age, to-wit [T.V.] 10 years of age, by PLACING HIS TONGUE ON THE VICTIM'S VAGINA. . . .

(App. A at 16).

The trial court instructed the jury that the State must prove the following three elements beyond a reasonable doubt:

> 1.   T.V. was less than 12 years of age.
>
> 2.   Paul Burns committed an act upon [T.V.] in which the sexual organ of [T.V.] was penetrated by or had union with the mouth of the defendant.
>
> 3.   Paul Burns was 18 years of age or older at the time of the sexual battery.

(App. A at 76).   The court instructed the jury that "union" meant contact (*id.*).

The *only* affirmative evidence presented by the State at trial to support the offense alleged in the information was T.V.'s recorded statement to the CPT interviewer, during which she stated twice that Burns touched her "tutu" with his tongue (App. E at 235, 239).[14]

During T.V.'s in-court direct testimony, she arguably partially recanted this statement:

> Q.   And, T[], when you said that Uncle Pauly touched your tutu, what did he touch your tutu with?
>
> A.   His tail.
>
> Q.   His tail?   Okay.   And what part—was there any other part that uncle Pauly used to touch your tutu?
>
> A.   Well, yes.
>
> Q.   Okay.   And what was that?   It's okay.   You can answer it.
>
> A.   He put it in—put his—put his tail under my tutu.   Because he did—something really, really, really nasty happened.
>
> Q.   Okay. And what nasty happened?
>
> A.   Well, I was embarrassed by him.
>
> Q.   Okay. Well, what did he do that made you embarrassed?

---

[14] Although Ms. Herrick testified that T.V. told her that "Uncle Pauly . . . licked her tutu," this testimony was offered at a July 31 pre-trial hearing (*see* App. B at 15–16).   At trial Ms. Herrick testified that during her first interview of T.V., she (T.V.) answered yes when asked whether Burns had ever touched her or "done anything to her private parts" (*see* App. E at 138).

A.  Because I had clothes on and I had a little dress on.

**Q.  Okay.  Now, did Uncle Pauly ever touch your tutu with his hand or with his tongue or something else?**

**A.  No; no; no; no.  His tail.**

**Q.  Just his tail?  Okay.  Did Uncle Pauly ever rub your tutu or lick your tutu or something else?**

**A.  He just licked it.**

**Q.  He licked it?  Okay.  And what part of Uncle Pauly's body did he use to lick your tutu?**

**A.  Well, he did that with his tail instead of his hand.**

**Q.  Instead of his hand?  Okay.  Did he ever use his tongue to lick your tutu?**

**A. No; no; no; no; no; no; no.  I don't think so.  He used his hand and his tail instead of his little tongue.**

Q.  Okay.  Did you ever see Uncle Pauly's tongue?

A.  Oh, no; no; no; no ; no, I haven't seen that.

Q.  Okay.  T[], did Uncle Pauly ever do anything else to you?

A.  Well , he didn't do anything else.  He—he—he can't help himself.  That's what he said; that.

(App. E at 168–70) (emphasis added).

The similar fact evidence, i.e., Jennifer Lopez's testimony described *supra*, arguably corroborated the specific act of oral union.

At issue in Burns' case is whether a conviction may rest solely upon an **out-of-court statement of the child victim**, if it is partially repudiated by the victim's in-court testimony and corroborated only by similar fact evidence.[15]   As noted by the Eleventh Circuit, albeit in an unpublished opinion, neither *Jackson* nor *Fiore* provides that prior inconsistent statements are insufficient to sustain a criminal conviction.   *See Williams v. Sec'y for Dep't of Corr.*, 395 F. App'x 524, 525 n.2 (11th Cir. 2010) (unpublished but cited as persuasive authority).   The jury in Burns' case had the opportunity to consider whether T.V.'s prior out-of-court statements were repudiated by her trial testimony, and if so, the circumstances under which, and

---

[15] The undersigned is aware that the Supreme Court has held that "a conviction must rest upon firmer ground than the **uncorroborated admission or confession of the accused**."   *Wong Sun v. United States*, 371 U.S. 471, 488–89 (1963); *see also Smith v. United States*, 348 U.S. 147, 153 (1954); *Opper v. United States*, 348 U.S. 84, 90 (1954).   The federal circuit courts have long followed this principle.   *See Fallada v. Dugger*, 819 F.2d 1564, 1570 (11th Cir. 1987); *see also United States v. Marshall*, 863 F.2d 1285, 1287 (6th Cir. 1988) (citing cases from all other circuits). The corroboration principle is rooted in "a long history of judicial experience with confessions and in the realization that sound law enforcement requires police investigations which extend beyond the words of the accused."   *Smith*, 348 U.S. at 153.   The purpose for corroboration is to "prevent errors in convictions based upon untrue confessions alone."   *Id.* (internal quotation marks and citation omitted).   The corroboration requirement "assure[s] reliability and truthfulness." *Marshall*, 863 F.2d at 1287.   In Burns' case, the trial court made a threshold finding that T.V.'s out-of-court statements were reliable.   It was the jury's role to assess the truthfulness of her out-of-court and in-court statements.

the extent to which the prior statements were repudiated.   The jury knew that T.V. was developmentally disabled who obviously had difficulty communicating during trial.   At trial, the jury watched and heard T.V.'s recorded interview with Ms. Meeks, the CPT interviewer, during which T.V. told Ms. Meeks that Burns touched her "tutu" with his mouth more than once.   When T.V. was called to the stand, she testified that Burns "licked" her "tutu" with his "tail," and also that "no, no, no, no . . ." she "didn't think" he ever used his tongue to lick her "tutu."   Although her in-court testimony could be viewed as at least a partial recantation of her prior recorded statement, a rational juror, who viewed T.V.'s demeanor, could have sifted through all of T.V. statements and the other evidence (including, the similar fact testimony from Ms. Lopez) and reached the conclusion that the inconsistencies during trial one year after the incident were the product of memory lapses, repressed memory due to stress, diminished capacity for communications, or any combination thereof, rather than a lack of candor.

Applying purely *federal law* to determine whether Burns' conviction violated the Due Process Clause, the undersigned concludes that a rational trier of fact could have found, beyond a reasonable doubt, that Burns' mouth had union with T.V.'s

vagina.   Therefore, Burns is not entitled to federal habeas relief on his federal due process challenge to the sufficiency of the evidence.

### b.   Federal Challenge to Trial Court's Ruling on T.V.'s Competency to Testify

In Ground Seven, Burns appears to assert a federal challenge to the trial court's ruling on T.V.'s competency to testify, independent of Burns' IAAC claim based upon appellate counsel's failure to challenge the trial court's competency ruling on direct appeal.   Burns did not present a challenge to the trial court's competency ruling on direct appeal; and to the extent he raised it in his Rule 3.850 motion, the state court relied upon the firmly established procedural rule discussed *supra*.   Therefore, Burns' challenge to the trial court's competency ruling is procedurally barred.   However, as previously discussed, Burns has demonstrated cause for the procedural default, because he established that his appellate counsel was ineffective for failing to challenge the trial court's competency ruling on direct appeal.   Burns has thus opened the gateway to federal consideration of his challenge to the trial court's ruling.

As previously discussed, under Florida law, the competency of a child witness is assessed based on:   "(1) whether the child is capable of observing and recollecting facts, (2) whether the child is capable of narrating those facts to the court or to a jury,

and (3) whether the child has a moral sense of the obligation to tell the truth." *Griffin v. State*, 526 So. 2d 752, 753 (Fla. 1st DCA 1988).   This inquiry is "one that must be announced on the record and it must be supported by findings of fact." *Barton v. State*, 704 So. 2d 569, 574 (Fla. 1st DCA 1997).   Further, the trial court is obligated to make an "adequate inquiry" concerning the child's sense of duty to tell the truth.   *S.C. v. State*, 837 So. 2d 1159, 1160 (Fla. 1st DCA 2003).

Burns' challenge to the trial court's ruling, which is based on state evidentiary law, is not a ground for habeas relief unless it affects the fundamental fairness of his trial in violation of his federal due process rights.   *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"); *see id.* at 70 (holding that petitioner's "due process rights were not violated by the admission of the evidence").

With respect to a due process challenge to a state trial court's determination of a witness's competency to testify, the Eleventh Circuit has noted that "'a lunatic may be allowed to testify if he is able to [comprehend] the obligation of an oath and give a correct account of matters he has seen or heard . . . .'"   *Sinclair v. Wainwright*, 814 F.2d 1516, 1522 (11th Cir. 1987) (quoting *Shuler v. Wainwright*, 491 F.2d 1213 (5th Cir. 1974)).   An opposing party may challenge competency, "whereupon it

becomes the duty of the court to make such an examination as will satisfy the court of the competency of the proposed witness." *Sinclair*, 814 F.2d at 1522 (citing *Shuler*, 491 F.2d at 1223–24). And if the challenged testimony is "crucial, critical or highly significant, failure to conduct an appropriate competency hearing implicates due process concerns of fundamental fairness." *Sinclair*, 814 F.2d at 1522–23 (citing *Hills v. Henderson*, 529 F.2d 397, 401 (5th Cir. 1976)). This is not to say "that every allusion as to incompetency of a witness is to be exhaustively explored by the trial judge, particularly where all other evidence substantiates competency." *Sinclair*, 814 F.2d at 1523 (internal quotation marks and citation omitted).

In *Sinclair*, the State offered Mr. Speights as an eyewitness to many of the critical aspects of the State's case against the defendant Sinclair. 814 F.2d at 1521, 1523. Mr. Speights had been declared incompetent to stand trial by the same judge who was trying the defendant Sinclair. *Id.* When Speights was called to testify, trial counsel objected on the basis that Speights had been previously adjudicated incompetent to stand trial. *Id.* at 1521. Defense counsel argued that the State should be required to show that Speights was now competent to be a witness. *Id.*

The trial judge overruled the objection without explanation and Speights was allowed to testify.  *Id.*

The Eleventh Circuit opined that "[o]nly by a reasonable exploration of all the facts and circumstances could the trial judge exercise sound discretion concerning the competency of the witness and the findings of the court with respect to competency should have been made to appear on the record."  *Id.* at 1523.  The court noted that the record reflected "no searching exploration and no stated reasons for overruling [the defendant's] competency objections."  *Id.*   The Eleventh Circuit remanded to the district court for an evidentiary hearing on the issue of the witness's competency to testify.  *Id.*   The court held:

> If the witness was competent, then appellant should suffer adverse judgment on his due process claim.  If the witness was incompetent, then, unless admission of his testimony was harmless beyond a reasonable doubt, a violation of due process should be found and judgment entered accordingly.

814 F.2d at 1523.

Here, unlike in *Sinclair*, the record is clear that the trial court permitted the parties to make reasonable inquiry into T.V.'s competency to testify.  Both the prosecutor and defense counsel conducted voir dire of T.V. as follows:

## VOIR DIRE EXAMINATION

BY MR. LEVY:   Okay, T[].   My name's [sic] James Levy and I represent Paul Burns.   Do you remember meeting me?

A.   Yeah.

Q.   Okay.   And when did we meet?

A.   Let me see.

THE COURT:   You don't have to go into when she met you.   She knows you .

MR. LEVY:   All right.

THE COURT:   Okay.

MR. LEVY:   It was more of a recollection.

THE COURT:   Okay.   Just get with your voir dire.

MR . LEVY:   Okay.

Q.   (By Mr. Levy) Okay.   And, T[], do you remember what you got for Christmas last year?

A.   Well, actually, I'm getting a "Search for Santa clause" DVD.

Q.   Now, I'm not talking about what's going to happen for this Christmas.   What—What did you receive last year for Christmas? What gifts did you receive?

A.   You'll see.   I have to admit (unintelligible) and people. Right?

Q.   I just want you to answer my questions, T[].   Can you clarify—can you—do you have—can you remember any gifts, even one gift , that you got last year for Christmas?

A.   Well, I've got a—a necklace, a peace sign necklace.

Q.   Okay.   And—and what day did you get that on?

A.   25th.

Q.   25th of which month?

A.   December.

Q.   Okay. And have you talked with anybody about how you're to testify today?

A.   Uh-huh.

Q.   Okay.   And what were you told?

A.   Well, I was told to tell the truth.

Q.   Okay.   So did anyone tell you to say anything that didn't happen?

A.   Uh-huh.

Q.   You're shaking your head yes?

A.   Yep.

Q.   Okay.   What did someone tell you to say today that didn't happen?

A.   Well—

MS. LIEB [the prosecutor]:   And, Your Honor, I'm going to object at this point.   He's getting into what her testimony will be.   And he can do that on cross.

THE COURT:   Well—

MR. LEVY:   I—I think it goes to her competence.

THE COURT:   Yeah. overruled.   Go ahead.

A.   Well, actually, sir, it was about that mean man, Uncle Pauly.

Q.   (By Mr. Levy) Okay.   And what did someone tell you to say?

A.   Well, my mother told me.

Q.   And what did your mother tell you?

A.   That Uncle Pauly was very, very ubiquitous.

Q.   Do you know what that word means?

A.   It means the same as—as—same as—and that's the word; what it means.

Q.   And what—how did you interpret that when she told you that—that Uncle Pauly was ubiquitous?

A.   Because he did the disgusting things that he did.

Q.   Okay. But you said your—your mom told you—told you to say something that didn't happen.   What was that that she told you to say that didn't happen?

A.  Well, it means that Uncle Pauly was really ridiculous. That's because he just did some—some nasty things.

Q.  But did your mom tell you to say anything?

A.  Well, uh-huh.

Q.  Okay.  So when you're saying your mom told you to say something, that's the truth?

A.  That's the truth.

Q.  Okay.  But you're having trouble recollecting or remembering what she told you?

A.  Well, I haven't been doing this right.  But—But Mom thinks that I didn't have control.   I'm perfectly fine I think.

Q.  I don't think I understand you, T[].   Can you explain to me what you are saying?

A.  Well—Well, I didn't have some trouble remembering because I just—I was just perfectly fine.

Q.  So you're perfectly fine?

A.  Uh-huh.
. . . .

MR. LEVY:  I would like to make a motion at this point just to challenge the competency.

THE COURT:  This would be the—

MS. LIEB:  And if I may follow up with a couple of questions, Your Honor?

THE COURT:   Okay.

EXAMINATION

BY MS. LIEB:

Q.   T[], you said something about the movie, "The Search for Santa Claus."   Have you ever seen the movie, "The Search for Santa Claus"?

A.   No; no; no; no, I haven't seen that.

Q.   Have—Have you ever watched the movie on T.V.?

A.   Huh-uh.

Q.   Okay.   Now, you said to Mr. Levy that your mom had told you to say something?

A.   Yeah.

Q.   Did your mom tell you to tell the truth?

A.   Uh-huh.

Q.   Yes?   Okay.   And did she tell you to tell the truth when you came in here today?
A.   Yeah.

Q.   Okay.   And do you remember meeting me before?

A.   Yes.

Q.   Okay.   And you remember telling Mr. Levy and me what Uncle Pauly had done?

A.  Right.

Q.  Okay.   And you promised to tell the truth about that in here today?

A.  Yes.

Q.  Okay.  Thank you.

THE   COURT:    All   right.    Your   objection   as   to competency is overruled.

(App. E at 161–66).

Unlike   the   circumstances   in   *Sinclair*,   the   trial   court   afforded   Burns   an appropriate hearing on the issue of T.V.'s competency to testify.   On the question of whether the trial court's finding that T.V. was competent to testify and thus permitting her to do so deprived Burns of a fundamentally fair trial, the undersigned concludes that, for the reasons discussed *supra*, a rational trier of fact could have found beyond a reasonable doubt that Burns' mouth had union with T.V.'s vagina (based not upon T.V.'s in-court testimony, but her out-of-court statements during the CPT interview).   Therefore, Burns has not demonstrated a federal due process violation with respect to the state court's competency determination.

To summarize the court's conclusions as to the claims asserted in Grounds Three and Seven, Burns has demonstrated that he received ineffective assistance of

appellate counsel with respect to appellate counsel's failure to challenge the trial

court's rulings on defense counsel's challenges to T.V.'s competency and the

sufficiency of the evidence to support the conviction.   Therefore, Burns is entitled

to federal habeas relief on the IAAC claims presented in Grounds Three and Seven.

With respect to Burns' federal due process claims, he has not demonstrated

that the trial court's rulings of T.V.'s competency and the sufficiency of the evidence

deprived him of a fundamentally fair trial in violation of the federal Constitution.

Therefore, he is not entitled to federal habeas relief on the federal due process claims

asserted in Grounds Three and Seven.

**C.     Ground Four:   "The trial court committed reversable [sic] error. Constitutional error [sic] by abusing its discretion allowing as clear and convincing inadmissible statements of Jennifer Jane Lopez that did not express a firm belief or conviction as to the truth."**

**Ground Eight:     "Petitioner avers his appellate counsel was constitutionally ineffective during his direct appellate review in violation of his Sixth Amendment rights to counsel guaranteed by the United States Constitution, depriving him due process of law in violation of his Fourteenth Amendment of the United States Constitution.   Appellate counsel was constitutionally ineffective for failing to brief the issue that the similar fact evidence was inadmissible and used to show bad character beyond the crime charged unduly [sic] prejudicial because it did not contain the higher degree of similarity required."**

In Ground Four, Burns alleges the case against him turned entirely on the

perceived truthfulness of T.V. (ECF No. 1 at 35–42).   Burns alleges the trial court

erred by allowing the State to introduce similar fact evidence of other crimes, wrongs, or acts (otherwise known as *Williams* Rule evidence), specifically Jennifer Lopez's testimony that he committed the same sexual act upon her when she was T.V.'s age (*id.*).   Burns alleges Ms. Lopez's testimony was unduly prejudicial and deprived him of due process and a fair trial (*id.*).

In Ground Eight, Burns alleges the trial court abused its discretion by determining that the similar fact testimony of Jennifer Lopez was credible and relevant, and that its probative value outweighed its use as bad character propensity evidence; and that appellate counsel overlooked this issue on direct appeal (ECF No. 1 at 84–87).

Burns states his appellate counsel failed to challenge the trial court's evidentiary ruling on direct appeal (ECF No. 1 at 34, 53 (as to Ground Four), 88 (as to Ground Eight).   Burns states he presented Grounds Four and Eight in his state habeas petition alleging ineffective assistance of appellate counsel (*id.*).

The State contends the claim of trial court error presented in Ground Four was not presented on direct appeal and is thus not exhausted (ECF No. 24 at 58).   The State contends to the extent Grounds Four and Eight present an IAAC claim based upon appellate counsel's failure to argue that the trial court erred by admitting the

*Williams* Rule evidence, Burns presented it to the First DCA in his petition alleging IAAC (*id.* at 58, 85–86). The State contends the First DCA's rejection of Burns' IAAC claim was not contrary to or an unreasonable application of clearly established federal law (*id.* at 59–68, 86).

The state court record supports the State's exhaustion argument. The record demonstrates that in Issue Four of Burns' amended state habeas petition alleging IAAC, Burns presented **verbatim** the claim he presents in Ground Four of his § 2254 petition, and **essentially the same** claim he presents in Ground Eight of his § 2254 petition (*compare* ECF No. 1 at 35–42, *with* App. CC at 50–57; and *compare* ECF No. 62–70, *with* App. CC at 10–17). The First DCA denied Burns' petition on the merits, without further explanation (App. EE).

The state court record also demonstrates that in Ground Four of Burns' Rule 3.850 motion, he presented **verbatim** the due process claim he presents in Ground Four of his § 2254 petition (*compare* ECF No. 1 at 35–42, *with* App. HH at 33–40). As previously discussed, the state circuit court denied Burns' Rule 3.850 motion as untimely and noted that Burns raised claims of trial court error that were not appropriately presented in a Rule 3.850 motion (App. HH at 88–91). The First DCA affirmed this decision without comment (App. MM).

As discussed *supra*, the state court's determinations, regarding the timeliness of Burns' Rule 3.850 motion and its power to adjudicate Burns' claims of trial court error, are in accordance with firmly established and regularly followed state procedural principles. Therefore, this court must honor the procedural rulings. Neither the "cause and prejudice" nor "miscarriage of justice" exception saves Burns' procedurally defaulted due process claim. Therefore, an independent federal due process claim, to the extent Burns asserts one, is procedurally barred from federal review.

This leaves for review Burns' IAAC claim presented in Grounds Four and Eight, i.e., that appellate counsel was ineffective for failing to argue that the trial court erred in admitting Ms. Lopez's testimony. Since Burns presented the claims as Issue Four of his state habeas petition, and the First DCA adjudicated the petition on the merits, the court will determine whether Burns has demonstrated that the state court's decision was contrary to or an unreasonable application of clearly established federal law, under § 2254(d).

1.    Clearly Established Federal Law

The clearly established law governing IAAC claims is set forth *supra*.

2.      Federal Review of State Court Decision

Prior to Burns' trial, the State filed a notice of intent to use similar fact evidence (i.e., *Williams* Rule evidence), specifically, Jennifer Lopez's testimony (*see* App. A at 29–30).   The trial court held a hearing on the admissibility of Ms. Lopez's testimony (App. E at 93–102).   Ms. Lopez testified she was born in March of 1980 (she was thirty-two years old at the time of Burns' trial) (*id.* at 93).   Ms. Lopez testified Burns was her biological father, but she did not live with him (*id.* at 93–94).   She testified the last time she saw Burns was during a two-week visit with him in Atlanta during the summer of 1990, when she was ten years old (*id.*).   Ms. Lopez testified that during that visit, Burns performed oral sex on her, had her place her mouth on his penis, and took pictures of her (*id.* at 94).   Ms. Lopez testified that the first time this happened, she and Burns were staying at an apartment (*id.* at 95). She testified Burns gave her a pill and then had her put her mouth on his penis (*id.*). Ms. Lopez testified Burns also performed oral sex on her and put his penis up to her vagina (*id.* at 96).   Ms. Lopez testified Burns sexually molested her a second time in his bedroom at his mother's apartment (*id.*).   Lopez testified Burns performed oral sex on her by placing his mouth on her vagina (*id.* at 97).   Ms. Lopez testified Burns took pictures of her, and Burns' sister found the pictures (*id.*).   Lopez testified

Burns' conduct was reported to law enforcement, and Burns was prosecuted (*id.* at 97–98).

On cross-examination, Ms. Lopez testified that prior to the sexual molestation, she loved her father and had a good relationship with him (App. E at 98–99). She testified that she and Burns corresponded while he was in prison (prior to the sexual molestation) (*id.*). Defense counsel asked Ms. Lopez how clear her memory of the incident was, and Ms. Lopez responded, "It's pretty clear. My memory of that night, it's like I couldn't remember any like conversations or specific words. I have pictures in my mind, flashes of an incident or acts that are very vivid (*id.* at 101). Ms. Lopez testified she was ten years old at the time of the molestation (*id.* at 102).

The State also proffered a certified copy of Burns' conviction in DeKalb County, Georgia, in 1990 for the molestation of Jennifer Lopez (App. E at 102).

Defense counsel objected to admission of Ms. Lopez's testimony, on the ground that the timing was too remote, the relationships between Burns and the two victims were different, and the circumstances of Burns' alleged conduct were different (App. E. at 105–06).

The trial court found "by clear and convincing evidence" that Ms. Lopez's testimony was credible and relevant to more than just Burns' character or propensity;

and that the probative value of her testimony outweighed its prejudicial effect (App. E at 105). However, the court limited the *Williams* Rule evidence to Ms. Lopez's testimony regarding Burns' acts of molestation (*id.*). The court did not permit Lopez to testify regarding Burns giving her a pill prior to one of the sexual acts, and the court prohibited the State from introducing pictures of Ms. Lopez or evidence of Burns' conviction (*id.*).

Prior to Ms. Lopez's trial testimony, the trial court instructed the jury as follows:

> Ladies and gentlemen, before this testimony begins, you are instructed that this evidence you are about to receive concerning evidence of other crimes, wrongs, or acts allegedly committed by the defendant will be considered by you for the limited purposes of proving motive, opportunity, intent, preparation, plan, knowledge, identity, the absence of mistake or accident on the part of the defendant. And you shall consider it only as it relates to that issue. However, the defendant is not on trial for a crime, wrong, or act that is not included in the information that I read to you earlier.

(App. E at 218). Ms. Lopez testified consistently with her proffered testimony (*id.* at 218–222).

The *Williams* Rule (named after *Williams v. State*, 110 So. 2d 654 (1959)) is codified in Florida Statutes § 90.404(2)(a) as follows:

**(2) Other crimes, wrongs, or acts.—**

(a) Similar fact evidence of other crimes, wrongs, or acts is admissible when relevant to prove a material fact in issue, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, but it is inadmissible when the evidence is relevant solely to prove bad character or propensity.

(b) 1.   In a criminal case in which the defendant is charged with a crime involving child molestation, evidence of the defendant's commission of other crimes, wrongs, or acts of child molestation is admissible, and may be considered for its bearing on any matter to which it is relevant.

Fla. Stat. § 90.404(2)(a), (b)1.

The Florida Supreme Court has explained that § 90.404(2)(b)1. "broadly provides that evidence of the defendant's commission of other acts of child molestation is admissible regardless of whether the charged and collateral offenses . . . share any similarity." *McLean v. State*, 934 So. 2d 1248 1259 (Fla. 2006). However, even under the relaxed standard of admissibility codified at section 90.404(2)(b), evidence of other acts of child molestation is subject to relevancy requirements and the probative value/unfair prejudice balancing test of section 90.403. *McLean*, 934 So. 2d at 1259.   For this reason, the similarity of the charged offense to the collateral offenses is still important to a trial court's decision regarding the admissibility of the collateral offenses. *Id.*   As the court explained in *McLean*,

the less similar the collateral offenses are to the charged offense, the less relevant they are and the more likely it is that their probative value will be "substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence."  *Id.* (quoting § 90.403, Fla. Stat. (2005)).   The *McLean* court cautioned that, "[w]hen necessary to ensure that a defendant receives a fair trial, the trial court should either exclude the evidence or substantially limit its presentation so that it does not become a feature of the trial." *Id.* at 1251.   Evidence of similar past acts becomes a feature of the trial when it "transcends the bounds of relevancy to the crime being charged" and "the prosecution devolves from development of facts pertinent to the main issue of guilt or innocence into an assault on the character of the defendant."   *Conde v. State*, 860 So. 2d 930, 945 (Fla. 2003) (internal quotation marks and citation omitted).

The question for the First DCA was whether Burns' appellate counsel was ineffective for failing to argue that the trial court abused its discretion in admitting Ms. Lopez's testimony.   Based upon Ms. Lopez's proffer and her trial testimony, the First DCA could have reasonably concluded that there was no reasonable probability the trial court's ruling would have been found to be an abuse of discretion.

Burns' defense was that the victim was not a reliable witness, and the molestation simply did not occur.   Burns argued in his state habeas petition that the number of similarities was insufficient, but under Florida law, "the number of similarities is not as important as the nature of the similarities in comparison to the purpose in admitting the evidence because, even under the general *Williams* rule standard, similarity is only a way of showing relevance."   *Easterly v. State*, 22 So. 3d 807, 815 (Fla. 1st DCA 2009).   Here, the acts Burns committed against Jennifer Lopez were similar to the acts he allegedly perpetrated on T.V., because he put his mouth on each girl's vagina; each girl was ten years old; and Burns had a close relationship with each girl (i.e., he was Lopez's biological, but not custodial, parent; and he was so close to T.V.'s family that she referred to him as her "uncle").

Further, the trial court substantially limited the presentation of the similar fact evidence so that it did not become a feature of the trial; and the court instructed the jury that it could consider the evidence for the limited purpose of proving motive, opportunity, intent, preparation, plan, knowledge, identity, the absence of mistake or accident.

Burns has not demonstrated that the First DCA's rejection of his IAAC claim was contrary to or an unreasonable application of *Strickland*.   And he has not

overcome the procedural bar to this court's consideration of an independent due process claim with respect to admission of the similar fact evidence, to the extent he asserts such a claim.   Burns is thus not entitled to federal habeas relief on Ground Four or Ground Eight.

**D.    Ground Two:    "Ineffective assistance of counsel based on counsel's failure to track down readily available and very likely useful evidence and witnesses that Petitioner counsel [sic] to obtain in violation of Petitioner's Sixth and Fourteenth Amendments [sic] of the United States Constitution."**

**Ground Five:    "Ineffective assistance of counsel based on counsel's failure to request to be declared indigent to hire an expert even after renewing the motion to declare Petitioner to be partially indigent. Moreover, there is no evidence that defense counsel contacted an expert nor securing [sic] independent psychological analysis and motion for funds.    In sum, defense counsel's failure to conduct any relevant research contributed significantly to his ineffectiveness.    And for counsel's lack of performance on the court's denial on the motion for continuance [sic].   The court said that appointing an expert to examine testimony that's not being admitted is denied, and it would also be the court's rational [sic] for denying the motion for continuance.   Yet the court said later that it would be admitted."**

**Ground Six:   "Counsel rendered ineffective assistance where the cumulative errors committed by counsel prejudiced the outcome of the proceedings against the Petitioner."**

**Ground Nine:    "Petitioner avers the extreme malfunction in Florida's criminal justice system is in contravention of the Sixth and Fourteenth Amendments of the United States Constitution."**

Burns presents claims of ineffective assistance of trial counsel in Grounds Two, Five, and Six, and a due process claim in Ground Nine (ECF No. 1 at 16–21, 54–61, 89–92).

The State asserts a procedural default defense to each of these claims (ECF No. 24 at 29–33, 69–72, 87–88). The State asserts Burns presented each of these claims in his Rule 3.850 motion; however, the state circuit court denied the Rule 3.850 motion as untimely, and the First DCA affirmed per curiam without a written opinion. The State contends the state's procedural bar is a firmly established and regularly followed state procedural rule; therefore, the federal habeas court should honor it.

The state court record supports the State's exhaustion defense. Burns presented each of these claims his Rule 3.850 motion, specifically, as Grounds One, Two, Five, and Six (App. HH at 20–27, 41–46). As previously discussed, the state circuit court denied Burns' Rule 3.850 motion as untimely (*id.* at 88–91), and the First DCA affirmed the lower court's decision (App. MM). For the reasons discussed *supra* in Grounds Three and Four, the state court's timeliness determination was in accordance with firmly established and regularly followed state procedural principles. Therefore, this federal court must honor the procedural

ruling.  Neither the "cause and prejudice" nor "miscarriage of justice" exception saves Burns' procedurally defaulted claims.  Therefore, Grounds Two, Five, Six, and Nine are procedurally barred from federal review.

## V.    CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  28 U.S.C. § 2254 Rule 11(a).  A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  28 U.S.C. § 2254 Rule 11(b).

"Section 2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right.'"  *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (quoting § 2253(c)(2)).  "At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'"  *Buck v. Davis*, 137 S. Ct. 759, 773 (2017) (citing *Miller-El*, 537

U.S. at 327).   Here, Burns cannot make that showing on any of his claims **except** the ineffective assistance of appellate counsel claims presented in Grounds Three and Seven.   Therefore, the undersigned recommends that the district court deny a certificate of appealability on all of Burns' other claims in its final order.

The second sentence of Rule 11(a) provides:   "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."   Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

That the petition for writ of habeas corpus (ECF No. 1) be **GRANTED IN PART AND DENIED IN PART AS FOLLOWS**:

1.    The petition be **GRANTED** with respect to the ineffective assistance of appellate counsel claims asserted in Grounds Three and Seven of the § 2254 petition, and the writ be issued conditioned on the State's providing Petitioner an opportunity to present his claims of trial court error (with respect to the trial court's rulings on the victim's competency to testify and the sufficiency of the

evidence to support the conviction) to the state appellate court within a reasonable time.

2. The petition be **DENIED** with respect to all of the remaining claims presented in the § 2254 petition, and a certificate of appealability be **DENIED** as to those claims.

At Pensacola, Florida, this <u>8th</u> day of December 2020.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M.   TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen days of the date of the Report and Recommendation.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control</u>.  An objecting party must serve a copy of the objections on all other parties.  A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**